LOVELL v. ISIDORE NEWMAN & SON et al.

(Circuit Court of Appeals, Fifth Circuit. January 2, 1912. Rehearing Denied February 6, 1912.)

No. 2,296.

1. SALES (§ 65*)—TERMS—CONDITIONS PRECEDENT—RESCISSION.

A statement in a contract of sale descriptive of the subject-matter or of some material incident such as the time or place of shipment is ordinarily to be regarded as a condition precedent, on the failure or nonperformance of which the party aggrieved may repudiate the contract.

[Ed. Note.—For other cases, see Sales, Cent. Dig. § 180; Dec. Dig. § 65.*]

2. CONTRACTS (§ 271*)—RESCISSION—NOTICE.

If a party intends to rescind a contract because of the other party's failure to perform, he should give clear notice of his intention to do so, unless the contract itself disposes of such notice, or unless notice becomes unnecessary by reason of the conduct of the parties.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 1190, 1191; Dec. Dig. § 271.*]

3. CARRIERS (§ 51*)—BILL OF LADING—EVIDENCE.

While a bill of lading unexplained is almost conclusive evidence of an intention to reserve to the shipper the jus dispondendi of the property, and a transfer of the bill ordinarily passes to the transferee the transferror's right to the goods described, yet the presumption of ownership arising from possession of the bill duly indorsed, etc., may be explained or rebutted by other evidence showing where the real ownership lies.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 148-149; Dec. Dig. § 51.*]

4. BANKRUPTCY (§ 140*)—SALE OF PROPERTY—APPLICATION—FORGED BILLS OF LADING.

Bankrupts, having sold a quantity of cotton through their broker to various Italian spinners, forged bills of lading purporting to show shipment of the entire quantity to New Orleans, and thence to Genoa by a steamship line specified in the contract, consigned to the shipper's order, with instructions to notify their broker. They then drew drafts for the price of the cotton, and annexed them to the fraudulent bills of lading, together with insurance certificates and invoices, the whole apparently in strict conformity to the contracts discounted the drafts, and received the money. The plaintiffs ultimately paid the drafts, and more than two months after the cotton should have been delivered the bankrupts did ship the identical quantity, consigned identically, except as to date, according to the forged bills, and after obtaining true bills of lading for this cotton held the same in their hands, but before the cotton had cleared the port, bankruptcy intervened, and it was claimed by the bankrupt's trustee. *Held*, that the spinners, having intervened and claimed the cotton and filed a delivery bond, would be presumed to have elected to receive the cotton under their contracts and to have waived the shipper's failure to comply with conditions of the contract relating to the time and manner of shipment, and that the title to the cotton so shipped was therefore in them, and not in the trustee.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 140.*]

In Error to the Circuit Court of the United States for the Eastern District of Louisiana.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

192 F.—48

Action by William S. Lovell, as trustee in bankruptcy of Knight, Yancey & Co., against Isidore Newman & Son and others. From a judgment for defendants (188 Fed. 534), plaintiff brings error. Affirmed.

It appears from the record that Knight, Yancey & Co., who had been for several years largely engaged in exporting cotton from the United States, were adjudicated bankrupts April 20, 1910. On the day following receivers were appointed, who, being thereunto duly authorized, instituted proceedings May 3, 1910, to restrain the removal from the jurisdiction of the court of 1,310 bales of cotton. At that time the cotton was aboard the steamship Ingelfingen at New Orleans en route to Italy. On May 6, 1910, an order for a temporary injunction was passed by the court, but it was therein provided that the cotton might be removed upon the execution of a bond by the defendant, conditioned to pay to the receivers of Knight, Yancey & Co., or to a trustee thereafter to be appointed, the cash value of the cotton if it should be adjudged that they had title to the same. The bond was duly filed by the master of the ship with Isidore Newman & Co. as sureties, and the cotton was transported to its destination and delivered to the Italian spinners, who have intervened in this proceeding. This suit was brought by the trustee in bankruptcy of Knight, Yancey & Co. upon the bond thus executed, and the following named parties were permitted to intervene as claimants of the cotton, to wit: The Cantonificio Cantoni, the Cantonificio Furter, the Manifattura Tosi, all Italian corporations, Gianoli Bros., and Bernocchi Bros., the two last named being partnerships and citizens of Italy.

The essential facts may be summarized as follows: Knight, Yancey & Co., through Gino Gavirati, a cotton broker of Milan, Italy, made eight certain contracts with the interveners, bearing date in December, 1909, and January, 1910. They provided for the shipment by Knight, Yancey & Co. of specified quantities of cotton of specified grades under through bills of lading to Genoa, Italy, via the Cotoniera Steamship Line. The interveners were to pay for the cotton at fixed prices by means of drafts to be drawn by Knight, Yancey & Co. on certain bankers designated in the contracts at 90 or 180 days sight. The cotton was to be shipped during January and February, 1910, and by the terms of the contracts it was the duty of Knight, Yancey & Co. to pay the insurance and freight. At the time fixed in the contracts Knight, Yancey & Co. drew on the designated bankers drafts for the contract price of the cotton. To each draft was attached an invoice; and each invoice referred by date to the contract under which the sale was made, bore the name of the purchasing spinners, and stated the purchase price, computed as provided in the contract. Knight, Yancey & Co. then attached to each draft and invoice what purported to be a bill of lading of the Southern Railway Company, drawn in accordance with the terms of the contract and consigning the cotton which it purported to cover through to Genoa. These bills of lading, which were in fact forgeries, ran to the order of the shipper and contained a direction to notify Gino Gavirati, the Italian broker through whom, as before stated, the contracts of sale had been concluded. A certificate of insurance was also attached to each set of documents, and by its terms the loss, if any, was payable to the indorsee of the certificate. The bills of lading, the drafts, the invoices, and the certificates each contained certain identifying marks—a combination of four letters with which they represented the cotton was marked. No cotton was shipped when Knight, Yancey & Co. issued the forged bills of lading and other documents mentioned. The drafts were thereupon sold by Knight, Yancey & Co. at their face value, less discount; and the drafts, bills of lading, and insurance certificates were indorsed in blank by them, and, still fastened together, were delivered to the discounting bank. The documents were then sent forward through the correspondents of the discounting bank to the bankers on whom the drafts were drawn. These bankers, who were duly authorized by the interveners, and who, like the interveners, honestly believed that the bills of lading were genuine and that the documents represented cotton actually shipped, accepted the drafts, and thereupon the bills of lading were delivered to the interveners.

The drafts were duly paid by the bank, which was reimbursed by the respective interveners. The result of the transaction was that Knight, Yancey & Co. received payment under the contracts without having shipped the cotton. Thereafter Knight. Yancey & Co., at various dates between March 16 and April 11, 1910, actually shipped the cotton called for by the contracts, and obtained therefor genuine bills of lading. The cotton so shipped bore the same identifying marks as that described in the forged bills, invoices, drafts, and insurance certificates, and it was of the same grades and quantities called for by the contracts. The genuine bills of lading were practically duplicates of the forged bills, save as to dates. The genuine bills were, and the spurious ones purported to be, executed by railroad agents at Decatur and Selma, Alabama. In the case of the Decatur shipments, Knight, Yancey & Co. retained in their possession the genuine bills of lading unindorsed for some six weeks. It appears from the record that the receivers were unable to obtain possession of the bills, but those representing the Decatur shipments, after remaining in possession of Knight, Yancey & Co. for the period of time above mentioned, were delivered to the trustee indorsed in blank on May 26, 1910. Touching the Selma shipments, the facts are somewhat different. It appears that the main office of Knight, Yancey & Co. was at Decatur, but they had another at Selma. The Selma bills were received by the duly authorized agent of Knight, Yancey & Co. at Selma from the railway company and were thereafter by him indorsed for Knight, Yancey & Co. and hypothecated with a bank in Selma as collateral security for advances of money made by it to Knight, Yancey & Co. The agent then attached the bills to negotiable drafts drawn by him, on Knight, Yancey & Co.. at Decatur in favor of the Selma bank for sums of money approximating the value of the cotton recovered by the bills of lading. The drafts were duly accepted by Knight, Yancey & Co. and the bills of lading were delivered to them on April 16, 1910, freed from any claim on the part of the bank. Knight, Yancey & Co. retained the Selma bills also until the appointment of the trustee, when they were delivered to him.

It may be added that the individual estates of the partners composing the firm of Knight, Yancey & Co., taken in connection with the estate of the partnership, are not sufficient to pay the claims which have been proved in bankruptcy against the partnership. No insurance was obtained on the cotton when it was actually shipped, and the only insurance effected in connection with the contracts between the parties was that evidenced by the certificates hereinbefore referred to, which were attached to the drafts and spurious bills of lading when the drafts were paid.

A jury having been waived in the court below, the cause was heard upon an agreed statement of facts. Upon the findings of fact filed by the court judgment was rendered in favor of the defendants and interveners, to which exceptions were duly taken by the trustee, who prosecutes a writ of error to review the judgment.

William A. Blount, A. C. Blount, Jr., F. B. Carter, Dufour & Dufour, and Percy, Benners & Burr, for plaintiff in error.

John W. Griffin, Haight, Sanford & Smith, and Dart, Kernan & Dart, for defendants in error.

Before PARDEE and McCORMICK, Circuit Judges, and MAXEY, District Judge.

MAXEY, District Judge (after stating the facts as above). Upon the trial of the case, a jury was waived by written stipulation of the parties, and the cause was submitted to the court upon an agreed statement of facts. The court, accepting such agreed statement as a basis, filed its findings of the ultimate facts, and rendered judgment in favor of the defendants and interveners, thus in effect holding that

the spinners[1] were the owners of the cotton at the date of the adjudication of bankruptcy, to wit, April 20, 1910. The trustee excepted to the judgment rendered, and insists that at the date mentioned the title to the cotton was in the bankrupts, and by operation of law it became vested eo instanti in him as the trustee of their estate. The question thus suggested is the vital one submitted for decision. If the spinners were the true owners of the cotton, the judgment was right; and, e converso, if the trustee was the owner, it was erroneous and should be reversed. Before entering upon an examination of the real question involved and in order to abbreviate the discussion, it may be well to state a few of the recognized and well-established principles of law which have been referred to and elaborated by counsel in their briefs.

[1] 1. In mercantile contracts time is of the essence. A statement descriptive of the subject-matter, or of some material incident, such as the time or place of shipment, is ordinarily to be regarded a condition precedent upon the failure or nonperformance of which the party aggrieved may repudiate the contract. Norrington v. Wright, 115 U. S. 188, 6 Sup. Ct. 12, 29 L. Ed. 366; Pope v. Allis, 115 U. S. 363, 6 Sup. Ct. 69, 29 L. Ed. 393; Jones v. United States, 96 U. S. 24, 24 L. Ed. 644.

[2] 2. If a party intend to repudiate or rescind a contract because of the failure of the other party to perform it, he should give clear notice of his intention to do so, unless the contract itself dispenses with such notice, or unless notice becomes unnecessary by reason of the conduct of the parties. Hennessy v. Bacon, 137 U. S. 84, 11 Sup. Ct. 17, 34 L. Ed. 605.

[3] 3. A bill of lading unexplained is almost conclusive evidence of an intention to reserve to the shipper the jus disponendi of the property. Dows v. National Exchange Bank, 91 U. S. 618, 23 L. Ed. 214. While the transfer of a bill passes to the transferee the transferror's title to the goods described, yet the presumption as to ownership arising from the bill may be explained or rebutted by other evidence showing where the real ownership lies. A pledgee to whom a bill of lading is given as security gets the legal title to the goods and the right of possession only if such is the intention of the parties, and that intention is open to explanation. Inquiry into the transaction in which the bill originated is not precluded because it came into the hands of persons who may have innocently paid value for it. The Carlos F. Roses, 177 U. S. 655, 20 Sup. Ct. 803, 44 L. Ed. 929.

4. A trustee of the estate of a bankrupt upon his appointment and qualification is vested by operation of law with the title to property of the bankrupt as of the date of the adjudication.

[4] Recurring to the crucial question submitted for consideration— that is, the true ownership of the cotton—it becomes necessary, for its proper determination, to carefully analyze the facts. The transactions eventuating in the present litigation originated in contracts

---

[1] NOTE.—For the sake of brevity the plaintiff in error will be referred to as "the trustee," the cotton buyers or the interveners as "the spinners," and Knight, Yancey & Co. as "the bankrupts."

made December, 1909, and January, 1910, by the bankrupts, through their broker, Gavirati, with the spinners for the purchase and delivery of certain cotton. The validity of the contracts is not questioned. They called for the shipment by the bankrupts of specified quantities of cotton of specified grades under through bills of lading to Genoa. The cotton was to be shipped in January and February, 1910. Insurance and freight were to be paid by the bankrupts, and the spinners were to make payment of the cotton by means of drafts to be drawn on certain designated bankers. No cotton was shipped by the bankrupts during the months of January and February. They, however, drew drafts on the bankers designated in the contracts for the price of the cotton and attached certificates of insurance, invoices, and forged bills of lading purporting to have been issued by the railroad company. By referring to the statement of the case, it will be seen that these bills of lading, concocted by John W. Knight as the managing partner of the firm, were issued pursuant to the directions of the contract, and that the bills, the drafts, the certificates of insurance, and the invoices identified the cotton purporting to have been shipped by certain marks composed of four letters. For example, one set of documents, including the draft, referred to cotton marked "TSST," and so with the others, each set denoting a like combination, but with different letters. It will be further noticed that there was a substantial correspondence in all of these documents, thus clearly showing that it was the deliberate purpose of the bankrupts to obtain money from the spinners by the fraudulent artifice thus devised. And this purpose was fully accomplished. The drafts were duly paid by the bankers of the spinners and the forged bills of lading were surrendered to the latter. The result was that the bankrupts obtained the money, and the spinners got the spurious bills of lading. In so far as the spinners and their bankers were concerned in the transaction, their conduct was perfectly honest and straightforward. Relying upon the good faith of the bankrupts, they acted upon the presumption that the bills of lading were genuine. They were ignorant of the fraud perpetrated upon them, and paid the drafts in the assurance that the cotton had been shipped in compliance with the terms of their contracts and as indicated in the bills of lading.

What then occurred? After the bankrupts had received pay for the cotton supposed by the shippers to be en route to its destination, the bankrupts in March and April—from March 16th to April 11th—a few weeks only after it should have been shipped under their contracts, made shipment of 1,400 bales via the Cotoniera Steamship Line to Genoa. For these shipments genuine through bills of lading were obtained from the railroad company at Decatur and Selma, Ala., and the cotton was transported to New Orleans, and there delivered to and put aboard the steamship Ingelfingen of the Cotoniera Line. The cotton was delivered to the steamship and taken aboard prior to the date of the restraining order, to wit, May 3, 1910. In this connection a comparison of the forged with the genuine bills of lading will prove instructive. In both the cotton was to be shipped by the Cotoniera Line to Genoa. In both the marks of the cotton were identical. In both Gavirati, the broker, was to be notified. In both the

same weights precisely were inserted. In both the forms used by the railroad company were similar, and the genuine bills were issued by the same agent whose name was used in the forged bills. It is evident there was a purpose to conform the genuine bills to those that were forged. What were the purpose and intent actuating the bankrupts? They knew that the forged bills had gone forward and were presumably in the possession of the spinners, since the drafts had been paid and they had received the money. They knew that the genuine bills, so carefully designed to correspond with those that were spurious, would not be necessary to insure the delivery of the cotton to the spinners. And with this knowledge their plain purpose was to suppress the genuine bills and permit the cotton to proceed to its destination under the forged bills, and thus prevent exposure of the fraud with consequences disastrous to themselves. In view of these facts who were the real owners of the cotton?

It is insisted by the trustee that, since the genuine bills of lading were made to the order of the bankrupts, they retained the title to and the jus disponendi of the cotton. It is true that the bills were executed as claimed, and that they were indorsed in blank and delivered to the trustee on May 26th. But on April 16th the bills were all in possession of the bankrupts and unindorsed. The cotton had then, at the date last mentioned, been delivered to the railroad company under through bills of lading for transportation to Genoa. At that date in whom did the title reside? The trustee answers in the bankrupts by virtue of the bills of lading executed to their order and remaining in their possession. But we have seen that, while a bill of lading is strong evidence of an intention to reserve to the shipper the jus disponendi of the property, yet such intention is always open to explanation, although the bill may have passed into the hands of an innocent purchaser for value. In the present case there are no intervening rights of third parties; the contest being between the bankrupts and their trustee on the one hand and the spinners on the other. In the absence of the bankruptcy of the parties, what would have been the attitude of the bankrupts? Could they have recovered the cotton or its value from the spinners? They had once been paid full value, and it would be shocking to the sense of justice to suppose that they could have enforced a second payment. If parties by their own fraudulent conduct may be estopped, the application of the doctrine would effectually cut them off from asserting that they had not delivered the cotton in pursuance of their solemn contracts. But we may go further. We are clearly of the opinion that, under the facts of this case, the delivery of the cotton to the carrier vested the ownership in the spinners, upon the theory that it was the intention of the bankrupts to appropriate it to the contracts. The court below properly so held in the following finding:

"That by marking and shipping the cotton, as above set out, Knight, Yancey & Co. intended to appropriate and did appropriate it to the fulfillment of the eight contracts of sale, and that by delivering it to the carrier they perfected delivery to the buyers under the terms of the contracts."

The case of Idaho, 93 U. S. 575, 23 L. Ed. 978, upon this question, is pertinent and material. To a proper understanding of the case it becomes necessary to insert the following lengthy excerpt from the opinion. At pages 581–583 of 93 U. S. (23 L. Ed. 978), it is said by the court:

"Recurring, then, to the inquiry whether Porter & Co., to whose order the steamer delivered the 165 bales of cotton, were the true owners of the cotton, a brief statement of the evidence on which their title rests is necessary. It originated as follows: On the 1st of April, 1869, one J. C. Forbes obtained from the master of the brig Colson, then lying at New Orleans, a bill of lading for 139 bales of cotton, described by specified marks. The bill was indorsed, and forwarded by Forbes to Porter & Co., and drafts against it to a large amount were drawn upon them, which they accepted, credited, and paid on or before the 7th of the month. In fact, however, when the bill of lading was given, no such cotton had been received by the brig; but on the 5th of April the agent of Forbes bought 140 bales, then at the shipper's press, and directed them to be sent to the Colson, marked substantially as described in the bill of lading. These bales were accordingly delivered from the press to the brig on the 8th of April, and the first and second mate receipted for them. They were not actually taken on board, but they were deposited on the pier, at the usual and ordinary place for the receipt of freight by the Colson, and an additional bill of lading for one bale only was taken by Forbes, and by him indorsed and transmitted to Porter & Co., together with an invoice of the 140 bales corresponding with the bills of lading. The marks and numbers on the bales were the same as those mentioned in the bills of lading, excepting only that 35 were marked 'L' instead of 36, and 16 marked 'S' instead of 15. There was also a small difference in the aggregate weight. That the cotton thus delivered to the Colson was intended to fill the bills of lading, one of which had been previously given, is incontrovertible. They were so intended by the shipper. If not, why were they thus marked? And why was a bill of lading taken for 1 bale only, instead of 140; and why was the invoice of the whole number sent? Such, also, was plainly the understanding of the ship. The receipts of the mates, and the fact that the master gave a bill of lading for 1 bale marked 'S,' where there were 16 bales thus marked, leave this beyond a reasonable doubt. What then? Why, the 140 bales thus shipped became from the moment of shipment the property of Porter & Co., to whom the bills of lading were indorsed. It is not only the utterance of common honesty, but the declaration of judicial tribunals, that a delivery of goods to a ship corresponding in substance with a bill of lading given previously, if intended and received to meet the bill of lading, makes the bill operative from the time of such delivery. At that instant it becomes evidence of the ownership of the goods. Thus in Rowley v. Bigelow, 12 Pick. [Mass.] 307 [23 Am. Dec. 607], it is said a bill of lading operates by way of estoppel against the master, and also against the shipper and indorser. 'The bill acknowledges the goods to be on board before the bill of lading is signed. But if, through inadvertence or otherwise, the bill of lading is signed before the goods are on board, upon the faith and assurance that they are at hand, as if they are received on the wharf ready to be shipped, or in the shipper's own warehouse, * * * and afterwards they are placed on board, as and for the goods embraced in the bill of lading, as against the shipper and master the bill will operate on those goods by way of relation and estoppel.' Such is also the doctrine asserted in Halliday v. Hamilton, 11 Wall. 565 [20 L. Ed. 214], and it is in harmony with the general rules that regulate the transfer of personal property. We do not say that a title to personal property may not be created between the issue of a bill of lading therefor and its delivery to the ship, which will prevail, over the master's bill, but, in the absence of any such intervening right, a bill of lading does cover goods subsequently delivered and received to fill it, and will represent the ownership of the goods. The cotton delivered on the 8th of April on the pier for the Colson, and received by the mates of the brig, became, therefore, at the in-

stant of its delivery, the property of Porter & Co., who were then the indorsees of the bills of lading. Its subsequent removal by Forbes to the Ladonia, either with or without the consent of the brig's officers, could not divert that ownership."

As in the Idaho Case, the delivery of the cotton to the Colson was intended to fill the bills of lading, although the delivery was made several days subsequent to the execution of the bills, so in 'the present case, where all the facts and circumstances are considered, the conclusion is evident that the bankrupts intended by the delivery of the cotton to the carrier to appropriate it to the contracts of the spinners. Indeed, any other conclusion would not only be inconsistent with the facts, but repugnant to the principles of common honesty and fair dealing as between merchant and merchant.

But it is contended by the trustee that the delivery was ineffective to pass title for the reason, among others, that there was no proof of assent on the part of the spinners. The contention is answered by the court in the case of Grove v. Brien, 8 How. 439 (12 L. Ed. 1142), where it is said:

"In the absence of all evidence to the contrary in case of an absolute assignment of property by a debtor to his creditors for the purpose of securing a pre-existing debt, an assent will be presumed on account of the benefit that he is to derive from it. This principle was recognized and applied by this court in the case of Tompkins v. Wheeler, 16 Pet. 106, 10 L. Ed. 903, and had been before in Brooks v. Marbury, 11 Wheat. 96, 6 L. Ed. 423. No expression of assent, the court say, of the person for whose benefit the assignment is made, is necessary to the vesting the title, as the creditor is rarely unwilling to receive his debt from any hand that will pay him."

There is nothing in the present record rebutting or tending to rebut such presumption in favor of the spinners. On the contrary, it appears that, when the temporary injunction was issued at the instance of the receivers, the steamship line promptly gave bond, by virtue of which the cotton was immediately transported under the bills of lading to Genoa for delivery to the spinners. In addition, upon the institution of the present suit by the trustee, the spinners filed their petition of intervention, in which it is insisted that they are the owners of the cotton, and were such owners prior to the date of the restraining order. In view of the circumstances of the case, the presumption must obtain that the spinners assented to the delivery of the cotton. If in such case assent of the spinners to the delivery of the cotton would be presumed, they would be equally presumed to have waived the time of the delivery as well as the failure of the bankrupts to have it insured. Certainly the bankrupts would not be in a position to deny there was a waiver, and in that respect the trustee can claim no right superior to that of the bankrupts themselves. While creditors are entitled to the protecting shield of the law, the rights of innocent purchasers are guarded and protected with equal jealousy. Under some circumstances, the bankruptcy statutes clothe the trustee with power to set aside conveyances, good as between the bankrupt and a purchaser. But ordinarily, in the absence of fraud, or of a state statute declaring the conveyance void, or unless it contravenes some provision of the bankruptcy acts, a conveyance, based upon a valuable

consideration and good as between the parties, will be permitted to stand. As to such a conveyance, and the spinners here stand in a similar category, the trustee occupies no better position than the bankrupt. He stands simply in the bankrupt's shoes. The principle has been clearly announced by the Supreme Court in the following cases: Thompson v. Fairbanks, 196 U. S. 516, 25 Sup. Ct. 306, 49 L. Ed. 577; Hewit v. Berlin Machine Works, 194 U. S. 296, 24 Sup. Ct. 690, 48 L. Ed. 986; Zartman v. First National Bank, 216 U. S. 134, 30 Sup. Ct. 368, 54 L. Ed. 418; York Manufacturing Co. v. Cassell, 201 U. S. 344, 26 Sup. Ct. 481, 50 L. Ed. 782.

Thus it was said by the court in the York Manufacturing Co. Case, 201 U. S. 352, 26 Sup. Ct. 484 (50 L. Ed. 782):

"Under the provisions of the bankruptcy act, the trustee in bankruptcy is vested with no better right or title to the bankrupt's property than belonged to the bankrupt at the time when the trustee's title accrued. At that time the right, as between the bankrupt and the York Manufacturing Company, was in the latter company to take the machinery on account of default in the payment therefor. The trustee under such circumstances stands simply in the shoes of the bankrupt, and as between them he has no greater right than the bankrupt. This is held in Hewit v. Berlin Machine Works, 194 U. S. 296 [24 Sup. Ct. 690, 48 L. Ed. 986]. The same view was taken in Thompson v. Fairbanks, 196 U. S. 516 [25 Sup. Ct. 306, 49 L. Ed. 577]. It was there stated that, 'under the present bankrupt act, the trustee takes the property of the bankrupt, in cases unaffected by fraud, in the same plight and condition that the bankrupt himself held it, and subject to all the equities impressed upon it in the hands of the bankrupt.'"

In the Case of Zartman, 216 U. S. 138, 30 Sup. Ct. 369 (54 L. Ed. 418), Mr. Chief Justice Fuller, as the organ of the court, used the following language:

"The position of the trustee in bankruptcy seems to be that the mistake made by Bacon in dictating or writing out the contract between himself and the Waterloo Bank 'is an asset in his hands as part of the estate of the bankrupt,' but we cannot agree to that. The trustee claims that he takes the same kind of title as a bona fide purchaser for value, but the rule applicable to this and all similar cases is that the trustee takes the property of the bankrupt, not as an innocent purchaser, but as the debtor had it at the time of the petition, subject to all valid claims, liens and equities. Thompson v. Fairbanks, 196 U. S. 516 [25 Sup. Ct. 306, 49 L. Ed. 577], and cases cited."

Bearing in mind the distinction we have noted, a perusal of Knapp v. Milwaukee Trust Co., 216 U. S. 545, 30 Sup. Ct. 412, 54 L. Ed. 610, Security Warehousing Co. v. Hand, 206 U. S. 415, 27 Sup. Ct. 720, 51 L. Ed. 1117, and other cases of like type, relied upon by the trustee, will demonstrate their inapplicability to the facts involved in the present controversy. To illustrate: The Knapp Case involved the validity of a mortgage, which contained provisions rendering it, under the laws of Wisconsin, fraudulent in law and void as to creditors. The court held that the bankruptcy act authorized the trustee to attack such a conveyance. But, referring to the case of the Security Warehousing Company, the court in the Knapp Case observed:

"The principle was recognized that the trustee in bankruptcy stands in the shoes of the bankrupt, and that the property in his hands is subject to the equities impressed upon it while in the hands of the bankrupt." 216 U. S. 557, 30 Sup. Ct. 415, 54 L. Ed. 610.

The cotton in question prior to the date that Knight, Yancey & Co. were adjudged bankrupts was the property of the spinners, and hence it could not have been lawfully transferred by the bankrupts, nor was it subject to levy and sale under judicial process against them.

Without special reference to the assignments of error, we have considered all material questions arising in the case, and for the reasons stated we are of the opinion that the judgment should be affirmed. So ordered.