## NEW YORK CENT. & H. R. R. CO. v. BANK OF HOLLY SPRINGS.

(Circuit Court of Appeals, Fifth Circuit. April 9, 1912.)

No. 2,305.

1. CARRIERS (§ 93*)—BILLS OF LADING—RIGHTS ACQUIRED.

A corporation engaged in buying and shipping cotton delivered cotton to a compress company, which issued receipts to the sellers. The receipts were attached to checks on a bank payable to the sellers, and the bank paid the checks, and received the receipts as security. The bank surrendered receipts for cotton, which the corporation shipped, and received bills of lading to which drafts drawn on the corporation were attached, and the bank gave the corporation credit therefor. The corporation forged bills of lading, and, on the faith of their validity, a third person honored drafts drawn on him by the corporation. *Held*, that the bank had, as against the carrier, the superior right, and the carrier, delivering the cotton to the third person pursuant to the forged bills of lading, was liable to it to the amount of its claim against the corporation, which had been adjudged a bankrupt.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 356–362; Dec. Dig. § 93.*]

2. BANKRUPTCY (§ 100*)—ADJUDICATION—PARTIES.

The court, in a suit between the holder of genuine bills of lading and the carrier delivering the freight to a holder of forged bills of lading, may not adjudicate any controversy between the shipper, which has been adjudged a bankrupt, and the holder of the forged bills of lading, not parties to the suit.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 60, 131, 141–144; Dec. Dig. § 100.*]

3. COSTS (§ 172*)—LIABILITY—PERSONS LIABLE.

Under the general rule, which requires each party to a litigation to pay his own counsel fees, the court, in a suit which is in effect an action for damages for conversion by a carrier of freight, may not require the defeated party to pay more than the legal taxable costs.

[Ed. Note.—For other cases, see Costs, Cent. Dig. §§ 665–687; Dec. Dig. § 172.*]

Appeal from the Circuit Court of the United States for the Northern District of Mississippi.

Suit by the New York Central & Hudson River Railroad Company against the Bank of Holly Springs, in which defendant filed a cross-bill. From a decree for defendant, complainant appeals. Modified and affirmed.

The following statement of the case is taken from the opinion filed by Judge Niles:

Complainant's bill filed in this cause alleges that defendant, the Bank of Holly Springs, had heretofore sued the New York Central & Hudson River Railroad Company (hereinafter called the Railroad Company) in the circuit court of Marshall county, Miss., for the value of 200 bales of cotton, alleged to have been taken and carried by the Illinois Central Railroad Company from Holly Springs, Miss., to the point at which it was delivered to the complainant for carriage to New York City, its destination, where it was alleged complainant refused to deliver said cotton to the Bank of Holly Springs (hereinafter called the Bank), notwithstanding the Bank presented bills of lading covering the said cotton, and demanded delivery; that the value of the said cotton was $15,000; that the Bank was the holder for value, and in due course of trade of said bills of lading covering the said cotton.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

The bill further alleges that this said suit was removed from the circuit court of Marshall county on petition of the Railroad Company upon the ground of diverse citizenship to the United States Circuit Court for the Western Division of the Northern District of Mississippi, on the law side thereof.

Subsequently the bill in this cause was filed as an original bill to enjoin the prosecution of the said suit at law, and to require the Bank to come into this cause, and by cross-bill set up its claim to the said cotton, in order that the Railroad Company might, by answer to such cross-bill, set up its defenses not pleadable at law.

A writ of injunction was issued restraining the Bank from any further prosecution of its suit at law, and requiring it to set up its claims by cross-bill in this cause. Whereupon the Bank filed its answer and a cross-bill, and the Railroad Company answered the Bank's cross-bill, denying liability.

From the record in this cause, it appears: That Steele, Miller & Co., of Corinth, Miss., were engaged in buying and shipping cotton on a large scale, and had been so for some years, maintaining an office at Holly Springs, Miss., and in the years 1909 and 1910, in charge of one E. E. Hughes as their agent. That the Bank agreed to finance their purchases of cotton at Holly Springs and vicinity during the cotton season of 1909-10, under the following arrangement: The agent of Steele, Miller & Co. at Holly Springs was to buy cotton brought in by wagons and have it placed in the warehouse of the Grenada Compress Company at Holly Springs, upon which compress warehouse receipts were to be issued to the sellers. These compress receipts were to be attached to a check drawn in the name of Steele, Miller & Co. by their agent on the Bank of Holly Springs, payable to the sellers, and when presented to the Bank, if the number of bales of cotton was covered by receipts, the Bank would pay the check so drawn and hold the receipts as collateral security for the amount of the check.

The said agent of Steele, Miller & Co. was also to buy cotton in neighboring towns, and have it shipped to Holly Springs and delivered to the compress. Upon such cotton coming in by rail, bills of lading were issued at the shipping point to shipper's order, and these were attached to drafts drawn by the sellers of such cotton on Steele, Miller & Co. at Holly Springs. To pay these drafts the said agent at Holly Springs would draw his check on the Bank, attaching thereto the said bills of lading which had accompanied the draft. The Bank would then pay the checks, at the same time delivering the bills of lading to the agent, who would immediately take same to the compress, and exchange them for warehouse compress receipts. These receipts were then turned over to the Bank to be held by it as security for the money paid on the checks to which the bills of lading were attached. By this system the Bank always held compress warehouse receipts covering cotton regarded by the Bank as of ample value to protect it in its advances to Steele, Miller & Co.

Pursuant to this arrangement, and never deviated from in the entire course of business relations between the parties, on April 11, 1910, the agent of Steele, Miller & Co. notified the Bank that, upon instructions from his firm, he wished to ship out 200 bales of cotton, and requested the Bank to deliver him compress receipts covering a like number of bales, in order that he might surrender same to the compress company and obtain therefrom what is called a "clearance" for such 200 bales as he desired to ship. A clearance is understood to be a notice in writing from the compress company to the Railroad Company to the effect that the cotton therein described was in the compress warehouse in the name of Steele, Miller & Co., and would be shipped in accordance with statements therein as to shipper, consignee, marks, routing, destination, etc. Thereupon the Bank, in response to this request of Steele, Miller & Co.'s agent, on April 11, 1910, delivered to their said agent, for the purpose heretofore mentioned, compress receipts covering 200 bales of cotton, taking the receipt of the said agent therefor, who then surrendered the receipts to the compress company and received from it the clearance. This compress clearance was then taken to the office of the Illinois Central Railroad Company at Holly Springs, whose agent, upon the faith of the compress clearance, issued two bills of lading under date of April 11, 1910, to shipper's order, each covering 100 bales of cotton. The

marks of the cotton in one were A S T U and in the other A S O N branded "STEELE," with the notation on the face of each "notify S. M. Weld & Co., 82 Beaver Street, N. Y." On the same day, April 11, 1910, Steele, Miller & Co.'s agent delivered to the Bank two drafts drawn by Steele, Miller & Co. on Steele, Miller & Co., at Corinth, Miss., respectively, for $7,920.63 and $7,622.18, to which were attached the two bills of lading heretofore mentioned as issued by the Illinois Central Railroad Company, under date of April 11, 1910. As stated, the said bills of lading had been obtained in exchange for the compress warehouse receipts covering 200 bales of cotton which the Bank had surrendered to Steele, Miller & Co.'s agent, at his request, and for the express purpose of enabling him to make a shipment of the said cotton. It may be stated that the Grenada Compress Company operated its business under what is known as the "block system," under which it is impossible to know with any degree of certainty whether or not the compress receipts surrendered to obtain the said bills of lading were the identical receipts covering the cotton mentioned in the bills of lading. The Bank immediately credited on its books the account of Steele, Miller & Co. with these drafts, and forwarded same for collection with the bills of lading attached. On presentation of the drafts at the main office of Steele, Miller & Co. at Corinth, payment of same was refused, and the drafts, with the attached bills of lading, were returned to the Bank. As stated, the bills of lading were drawn to shipper's order—that is, to the order of Steele, Miller & Co.—and were not indorsed by Steele, Miller & Co., nor their agent at Holly Springs when delivered to the Bank, nor did they bear indorsement until after the dishonored drafts of Steele, Miller & Co., to which said bills of lading were attached, had been returned from Corinth, when the bills of lading were indorsed: "Steele, Miller & Company, by E. E. Hughes, Agent." Meanwhile the cotton had gone forward and reached New York over the line of the New York Central & Hudson River Railroad. Thereupon the Bank presented the bills of lading held by it to the Railroad Company, and was advised by it that other bills of lading had been presented by S. M. Weld & Co., covering the 200 bales, and declined to deliver the cotton on the Bank's bills of lading, but delivered the cotton to Weld & Co. on the bills of lading presented by Weld & Co.

It is admitted that the bills of lading upon which Weld & Co. secured the cotton are fraudulent and fictitious, and that those held by the Bank are the genuine original bills of lading covering the cotton involved in this suit. Steele, Miller & Co., about this time, were discovered to be hopelessly insolvent, to the extent that their liabilities over assets ran into the millions, that they were in fact guilty of such criminal practices in the conduct of their business that the entire membership of the firm were convicted of such, and are now inmates of the federal penitentiary at Atlanta, Ga.

The Bank contends for its right to recover the value of the cotton from the Railroad Company, and that its refusal to deliver the cotton is a conversion, and that it is a bona fide holder for valuable consideration of the two original and genuine bills of lading issued by the Illinois Central Railroad Company for the said cotton. The Bank by its cross-bill prays that complainant pay it the value of said cotton, to wit, $15,000, with interest at 6 per cent. per annum from date of conversion, and that out of the value of the said cotton and the interest thereon it be allowed the balance of its debt, together with a reasonable attorney's fee, and all the expenses and court costs of this litigation, and the balance, if any, to be paid over to the trustee in bankruptcy of Steele, Miller & Co. to be applied to the debts of said Steele, Miller & Co. The Railroad Company denies conversion of the cotton in question, and relies upon its delivery to S. M. Weld & Co. as being the lawful owner of same, and therefore a good delivery, and a sufficient answer to the claim of the Bank. The Railroad Company claims the right to set up in its own defense any and all rights and equities which S. M. Weld & Co. had in and to said cotton, contending that if Weld & Co. were entitled to the cotton, legally or equitably, the delivery to them was not wrongful, and for this reason the Bank could not be heard to complain.

S. M. Weld & Co. is a partnership, the members of which are residents of the state of New York, and had been engaged in business in that city as

cotton buyers and brokers for several years prior to 1910, during which time they had transacted business with Steele, Miller & Co. On March 21, 1910, Steele, Miller & Co. drew its draft for $38,672.70 from Corinth, Miss., upon the firm of Weld & Co., and attached thereto several alleged railroad bills of lading covering cotton. Among said bills of lading there were two bills of lading professing upon their face to have been issued by the Illinois Central Railroad Company, through its agent, J. H. Pinkston, at Holly Springs, Miss., dated March 18, 1910, each being a shippers' order bill of lading, acknowledging receipt from Steele, Miller & Co. as shippers of cotton therein described. One of said bills of lading covered 100 bales of cotton marked A S O N, and the other 100 bales of cotton marked A S T U, each 100 bales of cotton, according to the description contained in the bill of lading, were also branded "STEELE." Each bill of lading also contained the following: "Notify S. M. Weld & Company, 82 Beaver Street, New York, New York." The indorsement of Steele, Miller & Co. upon each of said bills of lading is the genuine indorsement of that firm. S. M. Weld & Co., upon the faith and security of the two said bills of lading and the other bills of lading attached to said draft, did in good faith and without any notice whatever of any irregularity in the transaction on March 23, 1910, pay the draft of Steele, Miller & Co. for $38,673.70, of which amount $15,308.20 was paid upon the faith and security of the 200 bales of cotton professed to be covered by the said two bills of lading, marked A S O N and A S T U.

The said 200 bales of cotton so marked and branded were carried to the city of New York and placed with the German-American Stores in that city about April 25, 1910, that being a storage warehouse wherein the New York Central & Hudson River Railroad Company was in the habit of storing its cotton shipments. S. M. Weld & Co. were notified by the Railroad Company of the arrival of the cotton as described in the bills of lading, and on April 29, 1910, Weld & Co. presented the said bills of lading to the Railroad Company, and demanded the delivery of the said cotton before the presentation to it of any other bills of lading covering cotton of like mark and description. Between April 29 and May 3, 1910, the said 200 bales of cotton were delivered by the Railroad Company to Weld & Co. Before the delivery of the said cotton Weld & Co. knew that trouble had arisen over Steele, Miller & Co.'s cotton shipments, and that it was claimed that there were duplicate bills of lading outstanding covering some of their shipments, and that the Bank of Holly Springs claimed to hold bills of lading covering this 200 bales in question; the Bank claiming to hold the genuine bills of lading, and that those which had been presented by Weld & Co. were forgeries.

Attached to the said draft which was paid by Weld & Co. was an invoice describing the cotton. The amount paid by Weld & Co. on said drafts upon the security of the 200 bales of cotton marked A S T U and A S O N was $15,308.20, or 15.21 cents per pound on 100,648 pounds. S. M. Weld & Co. had no other security for the money paid on said draft other than the cotton supposed to be covered by the bills of lading, and the said draft was paid on March 23, 1910, in the regular and usual course of business and Weld & Co. have been repaid no part of said money on said draft, or any interest thereon. The Railroad Company delivered the 200 bales of cotton marked A S T U and A S O N to Weld & Co. at New York upon the surrender of the alleged bills of lading heretofore referred to, and the said bills of lading were then stamped canceled by said railroad. One hundred eighty-two bales of cotton had been delivered before any bills of lading were presented by the Bank of Holly Springs, but were still in the German-American Stores as the property of Weld & Co. when the bills of lading held by the Bank were presented. The Railroad Company instituted replevin proceedings to recover these 182 bales, so that the respective claimants could intervene in such suit and settle the question of ownership, but subsequently Weld & Co. gave to the Railroad an indemnifying bond to hold it harmless as between it and the Bank of Holly Springs, and said cotton was abandoned. After such bond was given, the other 18 bales of cotton were delivered to Weld & Co.

Complainant, having admitted the bills of lading upon which it delivered the cotton to Weld & Co. were fraudulent and fictitious and have no

effect because they were forgeries, nevertheless contend they were valid and enforceable contracts as between Steele, Miller & Co. and Weld & Co. to deliver the cotton to Weld & Co., thereby rendering Weld & Co. the true and lawful owners, unless the Bank have a superior title thereto, and the Bank must prove such superior title, and only as it proves its superior title to that of Weld & Co. can it complain of the delivery to Weld & Co.

In support of complainant's contention that Weld & Co. had a superior title to the cotton, it is urged that the Bank is unable to identify a single bale of cotton covered by the bills of lading which it holds, and therefore its securities by such loose methods of business pursued by the Bank, were so "swapped about and exchanged" as to place the record title and ownership of the 200 bales of cotton in Steele, Miller & Co. subject to the equities of Weld & Co. and of the Bank, and that the question resolves itself as to which party had the better equitable claim or lien.

Upon the final hearing the following decree was rendered:

That the Bank of Holly Springs, under its cross-bill filed in this cause, have and recover from the New York Central & Hudson River Railroad Company the value of the 200 bales of cotton in question, which is found to be fifteen thousand ($15,000) dollars, with interest at the rate of 6 per cent. per annum from the 29th day of April, 1910; that out of the value of said cotton and interest thereon the said cross-complainant, the Bank of Holly Springs, is allowed the balance of the indebtedness due from Steele, Miller & Co. to it, to wit, eleven thousand and twenty-five and $^{97}/_{100}$ ($11,025.97) dollars, with interest from August 1, 1910, at the rate of 8 per cent. per annum, together with an attorney's fee of $1,125, which is found to be a reasonable and proper compensation to be paid to Lester G. Fant, attorney for said bank, for legal services rendered in connection with the said 200 bales of cotton.

It is further ordered, adjudged, and decreed that the balance remaining of the recovery as hereinbefore decreed after satisfying the bank's debt, with interest and the attorney's fees, shall be by the said bank paid over to J. A. E. Pyle, trustee in bankruptcy for the estate of Steele, Miller & Co., bankrupt, to be applied to the claims of the general creditors of Steele, Miller & Co.; and it is further ordered that the New York Central & Hudson River Railroad Company pay all the costs of this suit and all the costs of the suit at law instituted by the Bank of Holly Springs against it, which is the said suit that was removed to the law side of this court and the prosecution of which was afterwards enjoined.

From the decree thus rendered the Railroad Company has appealed.

Henry Craft, for appellant.
Lester G. Fant, for appellee.

Before PARDEE and SHELBY, Circuit Judges, and MAXEY, District Judge.

MAXEY, District Judge (after stating the facts as above). There are but two parties litigant before the court, the railroad company and the Bank of Holly Springs, the former practically representing the interests of Weld & Co. The controversy, therefore, which may exist between Weld & Co. and the trustee in bankruptcy of Steele, Miller & Co., has no place in this suit, and may be summarily dismissed from our consideration.

[1] The real question submitted for decision is not difficult of solution. That question is: Who had the superior right to the cotton, the appellee or Weld & Co.? The former held the genuine bills of lading and the latter the forged bills. As against the appellee, the

forged bills passed no interest whatever, and the appellee was clearly entitled to appropriate so much of the cotton, or its proceeds, as was sufficient to satisfy its indebtedness against Steele, Miller & Co. To that extent and no further was the appellee interested in the 200 bales of cotton. This indebtedness, as found by the trial court, amounted to $11,025.97, with interest from August 1, 1910, at the rate of 8 per cent. per annum, and for the amount so found a decree was properly rendered in appellee's favor against the appellant. It is deemed proper to state that the conclusion here announced is in no manner inconsistent with the views expressed by this court in Lovell v. Newman & Son, 192 Fed. 753. In the Lovell Case we were careful to say, at page 758 of the reporter, that there were no intervening rights of third parties; "the contest being between the bankrupts and their trustee on the one hand and the spinners on the other."

[2] While the court was right in decreeing the sum of $11,025.97 in favor of the appellee, there was error in directing the surplus to be paid over to the trustee in bankruptcy of Steele, Miller & Co. As before stated, Weld & Co. and the trustee are not parties to the suit, and in their absence any controversy between them was not a proper subject of adjudication.

[3] We also think there was error in adjudging an attorney's fee in favor of the appellee. The general rule, subject to some exceptions in which the case at bar is not included, requires each party to the litigation to pay his own counsel fees. After stating the rule applicable to actions of debt, covenant, and assumpsit, the Supreme Court, speaking through Mr. Justice Swayne, in Oelrichs v. Spain, 15 Wall. 231, 21 L. Ed. 43, observed:

"In equity cases, when there is no injunction bond, only the taxable costs are allowed to the complainants. The same rule is applied to the defendant, however unjust the litigation on the other side, and however large the expensa litis to which he may have been subjected. The parties in this respect are upon a footing of equality. * * * When both client and counsel know that the fees are to be paid by the other party, there is danger of abuse. * * * We think the principle of disallowance rests upon a solid foundation, and that the opposite rule is forbidden by the analogies of the law and sound public policy."

See, also, Tullock v. Mulvane, 184 U. S. 511, 512, 22 Sup. Ct. 372, 46 L. Ed. 657; Lamar v. Hall & Wimberly, 129 Fed. 79, 63 C. C. A. 521; Farmers' Loan & Trust Co. v. Green, 79 Fed. 222, 24 C. C. A. 506; Gunby v. Armstrong, 133 Fed. 417, 66 C. C. A. 627; Work v. Tibbits, 87 Hun, 352, 34 N. Y. Supp. 308. No reason is perceived for requiring a defeated litigant in a case like the present one, which is, in effect, a suit for damages for the conversion of personal property, to pay more than the legal taxable costs. The court therefore erred in allowing the appellee counsel fees, and the same should be stricken out.

In adjudging a recovery in favor of the appellee in the sum of $11,025.97 with interest from August 1, 1910, at the rate of 8 per cent. per annum, the decree should stand. It, however, should be amended by eliminating the provision for counsel fees, and also the provision

which directs the surplus remaining after discharging the indebtedness of the appellee to be paid to the trustee in bankruptcy. As thus amended, the decree should be affirmed, and it is so ordered. The costs of the appeal will be divided equally between the parties.