TEXARKANA & FT. S. RY. CO. v. BRASS.*
(No. 438—3911.)

(Commission of Appeals of Texas, Section B.
April 9, 1924.)

1. Carriers ⟨∞⟩51—Nature of bill of lading
stated.

A bill of lading is a receipt and a contract
to carry.

2. Carriers ⟨∞⟩56—Blank indorsement of bill
of lading held symbolic delivery to new car-
rier.

The transfer of a bill of lading, indorsed in
blank, especially of an order bill of lading, is
ordinarily equivalent to a transfer of posses-
sion by symbolic delivery, if to new carrier.

3. Evidence ⟨∞⟩407(2)—Blank indorsement of
bill of lading held not conclusive as to re-
ceipt and delivery.

A bill of lading indorsed in blank is not
conclusive of delivery, but the receipt of goods
and the indorsement may, in the absence of
statute, be explained by extrinsic evidence, and
the intention of the parties controls the mean-
ing.

4. Evidence ⟨∞⟩407(2)—Undertaking of bill of
lading to transport cannot be impeached by
parol.

As respects the undertaking of a bill of
lading to transport from one point to another,
the bill is conclusive, and cannot be impeached
or varied by parol, and this is not merely a
rule of procedure but one of substantive law.

5. Carriers ⟨∞⟩174—Rights and liabilities of
connecting carrier issuing, in place of local
bills, export bills of lading from point of ori-
gin, to ship stated.

Where connecting carrier issued export bills
of lading, acknowledging receipt of cotton at
the point of origin in place of local bills of
lading, held that there was no ambiguity, but
the connecting carrier's obligation was to
transport from place of origin to the ship,
and it was entitled to receive the goods at the
point of origin or at any point along the
route, and to transport the goods to the ship
by any means it might provide.

6. Evidence ⟨∞⟩450(5)—Bill of lading provi-
sion that no carrier should be liable for loss
or damage except on "its own portion of
the through route" construed, as clearly ob-
ligating connecting carrier to transport from
point of origin to ship so that parol evidence
to explain meaning was inadmissible.

Where connecting carrier issued export bills
of lading, acknowledging receipt of the cotton
at A., the point of origin, providing that the
cotton should be carried from A. to P. and
thence by ship to Germany, and that "no car-
rier shall be liable for loss or damage not oc-
curring on its own road or its portion of the
through route," connecting carrier held clearly
obligated to transport from A. to the ship, and
parol evidence to explain the meaning thereof
was inadmissible, even though carrier had no
tracks into A.

7. Carriers ⟨∞⟩132—Cotton placed on compress
platform inferred to be for immediate ship-
ment.

Where bales of cotton were placed on a
compress platform, and bills of lading were is-
sued therefor, in the absence of contrary evi-
dence the inference was that the cotton was
placed there for immediate transportation, and
the obligation of carrier attached, whether the
actual movement of the cars was to begin im-
mediately or several days later, in view of Rev.
St. art. 713.

8. Carriers ⟨∞⟩51—Consistent construction of
bill of lading adopted in preference of in-
consistent instruction.

As between a construction of a bill of lad-
ing, consistent with other provisions thereof,
and a construction inconsistent therewith, the
consistent construction must be adopted.

9. Carriers ⟨∞⟩177(1)—Facts held not to neg-
ative assumption of relationship of carrier
from point of origin of shipment.

The fact that a carrier did not own tracks
at the place of origin of a shipment did not
negative the assumption of its relation as car-
rier from such point; where the bill of lading
acknowledged receipt of the goods at that
point.

10. Evidence ⟨∞⟩471(25)—Testimony that de-
livery to carrier at place named in bill of lad-
ing was impossible held inadmissible as con-
clusion of law.

Testimony of a railroad's agent who issued
bills of lading acknowledging receipt of the cot-
ton, that delivery to carrier at the point named
in the bills was impossible, held no evidence be-
cause a conclusion of law.

11. Evidence ⟨∞⟩413—Testimony as to impos-
sibility of delivery to carrier held inadmis-
sible as varying bill of lading.

Testimony that delivery of goods to car-
rier at place named in bill of lading was impos-
sible, because the carrier had no tracks at such
place, held no evidence because varying the ob-
ligation of a written contract.

12. Evidence ⟨∞⟩413—Stipulation of agreed
statement of facts held incompetent to vary
obligation of written instrument.

A stipulation in an agreed statement of
facts held incompetent to vary the terms of
unambiguous obligations of bills of lading.

13. Carriers ⟨∞⟩134—Evidence held not to sus-
tain burden on carrier to show freedom from
negligence for loss by fire.

In an action against a carrier for loss of
cotton destroyed by fire, evidence held not to
sustain burden on carrier to show freedom
from negligence.

14. Carriers ⟨∞⟩132—Carrier contracting
against loss held to have burden of showing
lack of negligence.

A carrier contracting against loss from fire
unless caused by negligence has burden of
showing its freedom from negligence.

⟨∞⟩For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes
*Rehearing overruled 262 S. W. ——.

**15. Carriers ⊂⟩136—Where evidence shows carrier used some care in protecting shipment, instructed verdict should not be given.**

Where, in an action for loss of goods by fire, evidence shows that carrier used some care in protecting the shipment, an instructed verdict should not be given.

**16. Carriers ⊂⟩134—Proof of destruction of cotton by fire and its nondelivery at destination held to establish prima facie case of negligence.**

Proof that cotton delivered to a carrier was destroyed by fire, and was not delivered at destination, *held* to establish a prima facie case of negligence by carrier, against which its limitation of liability as to fire could not operate, in the absence of rebutting evidence.

**17. Carriers ⊂⟩134—That shipper placed cotton on compress platform held not proof that ordinarily prudent person would permit it to remain there.**

That shipper placed cotton on the compress platform as a place of storage and testified that he did not think it was considered a dangerous place for the cotton, was no evidence that an ordinarily prudent person would have done nothing to remove the cotton from its exposed position, nor to protect it from danger by fire for five days.

**18. Carriers ⊂⟩115—Permitting cotton to remain on loading platform five days held negligence, rendering carrier liable.**

Permitting baled cotton to remain for five days on a loading platform, exposed to danger from fire by sparks from passing locomotives, *held* negligence, rendering carrier liable for loss by fire caused by sparks from locomotive of another carrier.

**19. Carriers ⊂⟩163—Carrier contracting against loss beyond its control has burden of showing lack of negligence.**

A carrier contracting against loss by causes beyond its control has the burden of proving that the loss was not caused by its negligence.

Error to Court of Civil Appeals of Fifth Supreme Judicial District.

Action by Franz Brass against the Texarkana & Fort Smith Railway Company. A judgment for plaintiff was affirmed by the Court of Civil Appeals (245 S. W. 457), and defendant brings error. Affirmed.

Wear & Wear, of Hillsboro, and King, Mahaffey & Wheeler, of Texarkana, for plaintiff in error.

C. M. Smithdeal, of Dallas, and Morrow & Stollenwerch, of Hillsboro, for defendant in error.

STAYTON, J. Franz Brass in 1908 brought this suit against the Texarkana & Ft. Smith Railway Company for the value of 26 bales of cotton, alleging the delivery of the cotton to defendant, as a common carrier, for transportation by it and a connecting carrier to Bremen, Germany, its destruction by fire thereafter, on account of defendant's negligence, and the failure of defendant at destination to redeliver. The defendant pleaded that there had been no delivery to it at the time of the fire, and that no liability was incurred by it, because, under the bills of lading issued by it, liability was excepted as to losses by fire, causes beyond its control, and occurrences not on its own line or its portion of the through route. The district court on the last trial instructed a verdict for the plaintiff, and, the ruling having been affirmed by the Court of Civil Appeals, the defendant submits, in his application for writ of error, that these decisions were erroneous because there was evidence negativing delivery and there was also evidence establishing that one or more of the exceptions in the bills of lading applied so as to relieve defendant of liability even in the event delivery was proved.

The assignment, and contentions under it, that raise these points, are considered, over objection, upon the authority of Walker v. Haley, 110 Tex. 50, 214 S. W. 295, and Clarendon Land, etc., Co. v. McClelland Brothers, 86 Tex. 179, 23 S. W. 576, 1100, 22 L. R. A. 105.

This court, on a former appeal (110 Tex. 281, 218 S. W. 1040), held against the contentions of the defendant on two of the controlling points now in the case. Parts of the opinion involving these points are quoted:

"The plaintiff made a prima facie case of delivery by introducing in evidence the bill of lading issued by defendant acknowledging receipt of the cotton. * * * The bill of lading issued by defendant contained a provision that the carrier should not be liable for the destruction of the cotton by fire, and the contention is made that the burden was on plaintiff to show that the loss occurred through the negligence of defendant. Whatever may be the rule in other jurisdictions, it is well settled in this state, that it is sufficient for the plaintiff, in a case of this character, to prove that the goods were delivered to the carrier and that they have not been received at their point of destination. This makes a prima facie case of negligence, which the carrier must rebut, or the plaintiff will recover."

[1] On the last trial, both of these prima facie cases were established; but defendant claims that there was evidence rebutting them. The evidence, therefore, will have to be examined in detail. The testimony bearing upon the theory that no delivery was made, and the effect of that testimony will be covered first. In this process it will be necessary to give proper effect to several rules and deductions of law—for the most part elementary—in addition to the principle first quoted above:

[2] To begin with, a bill of lading, as a written instrument, has two features, that of a receipt and that of a contract to carry. And the blank indorsement of such a

---

⊂⟩For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

bill, especially if it be an order bill, given for freight situated in a customary place of delivery, would ordinarily be equivalent, when the indorsed instrument is passed to a new carrier in return for its own bill of lading, to a transfer of the possession of the property covered by it to such new carrier, in that it would be a symbolic delivery of it. Amory Mfg. Co. v. G., C. & S. F. Ry. Co., 89 Tex. 424, 37 S. W. 856, 59 Am. St. Rep. 65; Houston, etc., Ry. Co. v. Hodde, 42 Tex. 471; M. P. Ry. Co. v. Heidenheimer, 82 Tex. 199, 17 S. W. 608, 27 Am. St. Rep. 861; Campbell v. Alford, 57 Tex. 159; Osborn v. Koenigheim, 57 Tex. 91; Chandler v. Fulton, 10 Tex. 19, 60 Am. Dec. 188.

[3] On the other hand, neither such a receipt nor such an indorsement is conclusive of delivery. Both, as in the case of any other mere receipt or any other blank indorsement, may, in the absence of contrary statute, be explained by extrinsic evidence; and the controlling question in reaching a conclusion contrary to what they prima facie say, would in either instance be, whether the parties to the instrument had a contrary intention to that of delivery. Campbell v. Alford, 57 Tex. 159; Cohen Brothers v. M., K. & T. Ry. Co., 44 Tex. Civ. App. 381, 98 S. W. 437; The Carlos F. Roses, 177 U. S. 655, 20 Sup. Ct. 803, 44 L. Ed. 929; Pollard v. Vinton, 105 U. S. 7, 26 L. Ed. 998; Lovell v. Isidore, 192 Fed. 756, 113 C. C. A. 39.

[4] The third rule to observe, and, it is thought, the one involving the vital and pervading principle in the present case, is that the contractual part of a bill of lading, the undertaking to transport from one point to another, is no different from the contractual part of any other written instrument in its conclusiveness against variance or impeachment by parol. The application of the rule in such an instance is said to be "too familiar for discussion or remark." Arnold v. Jones, 26 Tex. 337, 82 Am. Dec. 617.

And finally, in the present consideration, a corollary to the foregoing rule, and a principle that vitalizes it, is that it is not merely a rule of procedure but is one of substantive law. Because there is a written contract that has merged and destroyed the identity and force of all acts and intentions leading up to it, whether parol evidence of such acts and intentions be admitted without objection, or be sought to be established by argument or inference from facts admitted without objection, it equally follows that the outside matter, in the absence of ambiguity, fraud, accident, or mistake with respect to the contract, or of some other recognized "exception," is "incompetent," is "without probative force," is "intrinsically without weight," "cannot be shown, and "will not support a verdict." Sharp's Ex'r v. Baker, 22 Tex. 316; Henry v. Phillips, 105 Tex. 466, 151 S. W. 533; Southern Surety Co. v. Nalle & Co. (Tex. Com. App.) 242 S. W. 201; John E. Morrison Co. v. Riley (Tex. Civ. App.) 198 S. W. 1031; S. A. & A. P. Ry. Co. v. Timon, 45 Tex. Civ. App. 47, 99 S. W. 18; Pitcairn v. Philip Hiss Co., 125 Fed. 113, 61 C. C. A. 657.

With these principles in mind, the testimony upon the question of whether or not there was a delivery to defendant in the present case will now be examined. All of the record that has been suggested as bearing upon this question, and all that might in any way be claimed to bear upon it, is summarized below:

Plaintiff having accumulated 150 bales of cotton on a compress platform at Athens, Tex., where freight of that kind was customarily received for transportation by the two railroads having lines into that place, obtained local bills of lading for the consignment from one of those railroads (the Texas & New Orleans Railway Company). They were shipper's order bills and named Port Arthur, Tex., as destination. On the following day plaintiff, at Dallas, indorsed them in blank to the defendant company, and received from it the export bills of lading involved in this suit. The defendant had no rails into Athens, but connected with the carrier already mentioned at Port Arthur. The export bills of lading issued by defendant acknowledged receipt of the cotton at Athens, and provided that the cotton should be carried from that place to Port Arthur, Tex., and thence by the ship George Pyman to Bremen, Germany; and, among other clauses in it, was one reading:

"No carrier shall be liable for the loss or damage not occurring on its own road or its portion of the through route nor after said property is ready for delivery to the next carrier or to consignee."

The stipulation of the parties to the effect that the above facts might be considered as proved, also contained the statement that 26 of the 150 bales of cotton were, as already stated, destroyed by fire while still on the compress platform, and that after the fire all of the cotton described in the bills of lading, less the 26 bales burned, was loaded from the cotton compress platform by the local carrier, transported by it from Athens to Port Arthur, there delivered by it to the defendant Texarkana & Ft. Smith Railway Company, and carried by the latter company to the ship to be taken to destination.

The agent of defendant who issued the export bills of lading, testified to the effect that they, and the transactions attending their issuance, "meant" that the cotton was to be transported from Athens, Tex., to Port Arthur, Tex., by the local carrier, was to be delivered at the latter point to defendant, was to be transported by defendant from there to shipside and was to be carried by the ship to destination. He also testified that defendant had no line of railroad running to Athens, and that—

"The cotton covered by the bills of lading * * * was to be transported from Athens, Tex., by the Texas & New Orleans Railway Company to a point where it could be delivered to the Texarkana & Ft. Smith Railway Company, and this was to be done because the Texas & New Orleans Railway Company had issued its bills of lading for same, and there was no other way for it to reach and be delivered to the Texarkana & St. Smith Railway Company."

The effect of the foregoing testimony must be determined in the light of the well-settled rules of law already stated. All the questions relating to this phase of the case that need to be noticed are raised or suggested in the able argument of the defendant's counsel and will now be discussed.

[5] No fraud, accident, mistake, or other exception to the parol evidence rule was either alleged or proved. There was no ambiguity in the contracts that were entered into between plaintiff and defendant. It may be conceded that the indorsement of the local bills of lading to defendant and defendant's issuance of the export bills of lading took place at the same time and were parts of the same transaction. It is suggested that this raised an ambiguity with respect to the duties of defendant. But it is thought not. Defendant's sole obligation was to transport from Athens to the ship, and that, in its entirety, was its distinct obligation. Its receiving the local bills of lading by indorsement did not place upon it the conflicting obligation of allowing the local carrier to transport the freight from Athens to Port Arthur; it merely had the effect of permitting defendant to allow that carrier, as its bailee or as its agent, to perform that part of the obligation which defendant for a valuable consideration had assumed. It received a right or option that it was under no duty to enjoy. The indorsement did not destroy defendant's right and power to receive the cotton immediately at point of origin or at any point along the route, and to perform the transportation to Port Arthur by such means or agency as it might already have or might provide; but, on the contrary, the common-law privilege of diversion on the part of the indorsee of an order bill of lading is always open, and open as a matter of right; and so was available on defendant's part. Hutchinson on Carriers, §§ 660, 661; S. A. & A. P. Ry. Co. v. Bracht (Tex. Civ. App.) 157 S. W. 269. No ambiguity was raised by the transactions.

[6] Moreover, no ambiguity was raised by the clause in the export bills of lading reading, "No carrier shall be liable for the loss or damage not occurring on its own road or its portion of the through route." But on the contrary, as a matter of law, a proper construction of those contracts shows a clear obligation to transport from Athens to the ship, and hence requires and permits no evidence outside of the writings themselves in aid of construction. Defendant had no line of rails to Athens. Therefore, if it was by contract to be harmless as to loss "occurring on its own road," it may well be contended that it was to be harmless until its line was reached by the freight in transit. But, the asserted limitation does not stop there, as do similar clauses in many bills of lading involved in the reported cases. It continues "or its portion of the through route." Before the limitation is operative, therefore, it must appear also that the loss did not occur "on its portion of the through route." If that alternative applied to the trip from Athens to the ship, then clearly the limitation did not exclude that part of the transportation. "Road" and "route" are not synonymous; and the wording of these contracts treat them as of different meaning.

The bills of lading on their face show that the through route was from Athens, Tex., to Bremen, Germany. What was defendant's "portion" of this through route? The obligation of the bills of lading answer the question. They read, to carry the cotton "from Athens, Tex., to Port Arthur, Tex." What was the other portion of the through route? These writings also answer this question, "thence by the ship George Pyman to the port of Bremen, Germany." The bills of lading themselves, then, establish as the defendant's portion of the through route, as to which liability was not excepted, the initial part of the route from Athens to Port Arthur, and establish, as the portion of the through route pertaining to the owners of the ship, the final part of the trip from Port Arthur to Bremen. Hence there is no ambiguity, but a plain and clear obligation is made out by the contract itself.

[7] Another question arises upon the basis of the clause above discussed, which, while it does not apply to the question of delivery of the cotton to defendant, is relevant to the opinion just expressed upon the significance of that clause, and, may, for that reason, be conveniently interpolated at this point. It is that the limitation absolved the defendant of liability while the cotton was on the compress platform, because that place was neither on the road of the defendant nor on any portion of the through route. But it would seem that cotton, if delivered to defendant on the compress platform at Athens, Tex., and there destroyed by fire, would be considered as on defendant's portion of the through route, whether the matter be considered on common-law principles or under the statute. There is nothing in the evidence to show that the delivery was for the purpose of storage or warehousing or was subject to further shipping orders from the shipper, but the distinct inference is that it was for the purpose of immediate transportation. At any rate, immediate transportation is meant, upon delivery to a carrier, when nothing to

the contrary appears; and, if there was a delivery to the defendant for immediate transportation, its obligation and liability as a carrier attached thereupon, whether the actual movement of the cars was to begin immediately or several days later. G., C. & S. F. Ry. Co. v. Trawick, 80 Tex. 274, 15 S. W. 568, 18 S. W. 948; 1 Hutchinson on Carriers, 109; I. & G. N. Ry. Co. v. Dimmit Co., etc., 5 Tex. Civ. App. 186, 23 S. W. 754. Especially is this true under R. S. art. 713, which declares that the "trip or voyage shall be considered as having commenced from the time of the signing of the bill of lading, and the liability of the common carrier shall attach, as at common law, from and after such signing." Texas & Pacific Ry. Co. v. Nicholson, 61 Tex. 491.

It must follow that, under the facts of this case, the defendant, having contracted to transport this cotton from Athens to shipside, its portion of the through route was from, and including, the place of delivery to it under its bills of lading, to the place of its connection with the succeeding carrier, which, in this case, was the ship. Therefore this clause of the bills of lading does not absolve it of liability on the theory that the fire occurred at a point excepted by those contracts.

[8, 9] But defendant objects that there was no delivery because it had no line of railroad to Athens and could not take delivery, and because of the testimony of its agent, already summarized above.

It contends, first, that, in view of the fact that it had no line of railroad into Athens, the limitation of liability to its own line or its portion of the through route showed an intention that it was not to receive delivery prior to the time the local carrier should transport the cotton to Port Arthur and there deliver it to defendant. But, as has been observed, this limitation could not apply to the route from Athens to shipside without conflicting with the obligation in the bills of lading to transport over that entire distance, with Athens as the point of origin, and the ship as the point of connection between the initial and the final carrier. On that obligation this case pivots. The limitation, on the other hand, may be given full effect as to the route beyond shipside. By reason of it the defendant was clearly not liable as to that part of the route. As between this consistent construction of the clause and the other inconsistent construction of it, the consistent construction must be adopted.

The fact that the defendant did not have a line of railroad into Athens, Tex., does not in any wise negative its assumption of the relation of a carrier from that point. Trackage and agency and contractual arrangements, including those resembling and having the effect of partnerships, are not improbable among connecting carriers; and, by resort to any of these or to any other modern mode of transportation, the defendant could have undertaken its obligations, though it owned no rails into Athens.

"If a party charge himself with an obligation possible to be performed, he must abide by it unless performance is rendered impossible by the act of God, the law, or the other party. * * * He takes the risk within the limits of his undertaking." Columbus Ry. & Power Co. v. Columbus, 249 U. S. 412, 39 Sup. Ct. 349, 63 L. Ed. 669, 6 A. L. R. 1648.

"The contract of affreightment is governed by the same principles as other special contracts. * * * If what is agreed to be done is possible and lawful, it must be done. Difficulty or improbability of accomplishing the undertaking will not avail the defendant. It must be shown that the thing cannot by any means be effected. Nothing short of this will excuse nonperformance." The Harriman, 9 Wall. 171, 19 L. Ed. 629.

It is obvious that the extent of these undoubtedly correct opinions does not need to be approached in this case.

[10] The testimony of defendant's agent, already summarized, does not add any weight to the solution of the question of whether there was a delivery to defendant, as the bills of lading state there was. Consideration of this testimony reveals that the witness was not undertaking to testify to facts, or as to what was said and done between himself and plaintiff, as evidence of their mutual intention, or indeed, as to what any one's intention was, in any of the transactions of plaintiff; but that, on the contrary, he was testifying as to what the bills of lading and the transactions "meant" and as to the impossibility of a "delivery" to defendant "under the bills of lading" short of Beaumont or Port Arthur, because, as he said, it had no line of railroad nearer to Athens than those points, and there was no other way, consequently, for the freight "to reach and be delivered" to it than to be first transported by the Texas & New Orleans Railway Company. His testimony was not evidence that could have aided the jury, but amounted to an opinion of law that was beyond both their province and that of the witness, and that "could not establish the fact." Joske v. Irvine, 91 Tex. at page 577, 44 S. W. 1059. The opinion that the bales could not have been delivered to defendant at Athens because of its nonownership of tracks to that point is inadmissible even as a conclusion of law. As already observed, it did not need to own tracks to receive delivery nor, after delivery, to carry the freight. It may be repeated that arrangements for transportation could have been made through ordinary business negotiations with the local carrier. Certainly they were within the realm of possibility. The defendant, as has been observed also, was not obliged to allow the local carrier to perform the contract evidenced by the local bills of lading, but through the

indorsement of such bills held the means of taking the cotton from that carrier on the platform at Athens, and to act under whatever arrangements it had already made or chose still to make. Whatever risk, burden, and expense were attached to its undertaking in these respects, it assumed them by its contracts.

[11] But by far the most conclusive consideration against the testimony of this agent is that it had the effect, if given any weight, to vary the obligation of the written contract. His statement that delivery was to be made to defendant at Port Arthur or at any other point than Athens cannot be maintained. Why? Because the written contract was to carry from Athens to Port Arthur. The only possible negation of delivery that was open to defendant was therefore with regard to the point of Athens. But as to this, the witnesses' testimony, as stated, is a mere construction of the bills of lading and, under the opinion in the Joske Case, is no evidence.

[12] The agreed statement of facts is to the effect that all of the 150 bales of cotton, except the 26 bales that were burned, were not delivered to the defendant until Port Arthur was reached. May it be contended that there was no distinction between the whole lot and the portion that was burned, and that therefore the effect of the agreement was that the burned bales were not delivered at all or that therefore there was no intention to deliver them at Athens? Either of these argumentative conclusions seems remote. The carefully worded written agreement in this respect expressly excepted the 26 bales, for the loss of which this suit was brought. It only purported to affect the saved bales; and even at that, though it was testimony, it was incompetent, because it was at variance with the written, unambiguous obligation in the export bills of lading to carry to Port Arthur. Delivery was necessarily a condition precedent, not subsequent, to that obligation, and could not, under these bills of lading, in the absence of a mutual modification of them, have taken place at Port Arthur or at any other place than Athens, which was the contractual point of origin.

On the whole, there would seem, therefore, to have been no evidence with any probative force to rebut the prima facie case of delivery made by the acknowledgments in the bills of lading issued by defendant.

It is considered, moreover, that there was no evidence to relieve defendant upon the other branch of the case—that is, upon the basis of the limitations contained in its bills of lading. One of these limitations has already been disposed of, and the other will be examined now. Besides the wording of the bills of lading, already mentioned, and the testimony to the effect that the defendant owned no line running to Athens, Tex., all of the evidence upon this issue may, be-

cause of its brevity in the record, be shortly stated.

[13] The remaining limitation read:

"No carrier in possession of all or any of the cotton herein described shall be liable for any loss thereof or damage thereto by cause beyond its control or by floods or by fire."

During the cotton season, prior to the transactions involved in this suit, the plaintiff was buying cotton in Athens, Tex., and assembling it in the yards and on the compress. He shipped a "lot" of that kind of freight in that season, and testified that he did not "think" the platform of the compress "was regarded as a dangerous place for cotton." When cotton was to be shipped from Athens, Tex., and was situated on this platform, it was the custom and practice of the railroads having lines at that point to receive and load. The cotton which was being bought by plaintiff, or for him by others, at Athens and in the vicinity of that place, was being assembled or stored on the platform. January 2, 1908, plaintiff's 150 bales, together with other bales, were so situated. The next day the defendant's export bills of lading were issued. The shipment was not moved for at least five days, at which time sparks of fire were thrown on some of the cotton, then on the platform, by a locomotive, owned and being operated by the St. Louis & Southwestern Railway Company of Texas, which was passing along on its own tracks close to the cotton, and thereby a considerable number of the bales were caused to be damaged or destroyed by fire. The 150 bales delivered to the defendant had remained and were still on the platform, and the 26 bales of the lot caught either from the sparks or from the flames of the cotton set on fire by those sparks, and were in that manner destroyed. The agreed facts read that the fire was caused by the negligence of the St. Louis & Southwestern Railway Company of Texas, in failing to exercise ordinary care to equip its locomotives with such a spark arrester as it was under legal duty to use, and in failing to exercise ordinary care in the operation of such locomotive, to prevent setting fire to property situated near the track. The platform was located on the north side of this company's railroad and 15 to 20 feet away from the main line. One of the side tracks passed immediately adjacent to the compress property. About 15 minutes before the fire occurred, a freight train was in the yard and went by the platform in a southerly direction. A moderate southerly wind was blowing at the time towards the cotton. The freight trains of that company were burning coal for fuel. One eyewitness testified:

"It is true that just before the fire the cotton belonging to Franz Brass was on the platform in such place and in such condition as to be exposed to sparks of fire from passing engines, and I suppose the employees of the railroad companies knew the condition of the

cotton. Yes; I knew that the cotton was in danger of being ignited by sparks from passing engines. I knew this by seeing it."

The fire occurred at midday. After its occurrence, all of the 150 bales, excepting the 26 bales that were burned, were loaded onto cars and transported to Port Arthur.

This was all of the testimony.

[14] The burden of proof, as stated, was upon the defendant to show that the loss of the cotton was without negligence on its part. But it is not thought that defendant did so. No importance will be given to the statement of the witness, above mentioned, that he supposed the employees of the railroad knew of the condition of the cotton, because that was a mere surmise and not evidence. Neither will any undue importance be given to the agreed fact that the negligence of the St. Louis & Southwestern Railway Company caused the fire. That merely accounted for the fire. It did not assert that defendant could not have prevented or avoided the loss—the injury to plaintiff—through the exercise of ordinary care nor even that the negligence of defendant did not concur in producing that effect.

[15, 16] It is realized that, if the testimony had shown some care, the instructed verdict should not have been given. But it showed no care whatever. It may also very well be that, if it had shown circumstances in view of which a jury could have found that an ordinarily prudent man would have felt secure with things as they were and would have done nothing in particular to protect or save the cotton, the case would have been for the jury. But this is not such an instance.

As was decided on the last appeal of this case, when the plaintiff established that the bales were destroyed by fire and were not redelivered at destination, he established a prima facie case of negligence, against which defendant's limitation as to fire could not operate, in the absence of rebutting evidence. The defendant therefore was negligent unless it proved otherwise.

[17] It was shown that plaintiff had made use of the compress platform as a place of storage on former occasions and he testified that he did not "think" it was "considered" as a dangerous place for cotton. This was no evidence that an ordinarily prudent man, situated as was the defendant, would under the particular circumstances of the present shipment, have done nothing to move the cotton from an exposed position for a period of five days, nor to protect it from danger by fire. The fact that plaintiff had used the platform himself might furnish an argument based upon a rough view of fair play; for instance, if the platform was safe enough for plaintiff, it was safe enough for defendant. But it did not amount to more. Plaintiff was not shown to be an ordinarily pru-

dent man, whose acts or omissions would negative negligence; nor were any of the conditions between this and former occasions shown to be alike with regard to surroundings, duration of storage, or precautions. The second part of plaintiff's testimony is in a like class. It was only a surmise of a surmise; he did not "think" that some undefined person or persons "considered" the place dangerous. It would clearly appear, therefore, that this testimony comes under the rule of Joske v. Irvine, that "it is the duty of the court to instruct a verdict, though there be slight testimony, if its probative force be so weak that it only raises a mere surmise or suspicion of the existence of a fact sought to be established—such testimony in legal contemplation falling short of being 'any evidence.'"

[18] But the evidence does show that the cotton in this instance was on a platform near a railroad yard, and very close to tracks over which engines passed, emitting sparks, that one of the companies using the tracks burned coal and did not have spark arresters on its engines, and that the cotton, though for immediate shipment, was for at least five days' time at such a place and in such condition as to be exposed to any sparks from passing engines. On the day of the fire the wind was blowing from the tracks towards the cotton. Cotton is highly inflammable. This situation called for more care. And, it may be repeated, as to any care whatever the record is silent. There was no evidence of any means that were used to protect or watch the cotton and there was none as to any efforts to save it from fire after fire started on the platform. In this state of the evidence, it cannot be said that the presumption of negligence was disproved by the defendant, either by a showing that it was diligent, or by a showing that it was not negligent. Ryan v. M., K. & T. Ry. Co., 65 Tex. 19, 57 Am. Rep. 589; M. P. Ry. Co. v. China Mfg. Co., 79 Tex. 26, 14 S. W. 785; W. U. Telegraph Co. v. National Bank, 97 Tex. 227, 77 S. W. 603, 65 L. R. A. 805, 1 Ann. Cas. 573; Belcher v. M., K. & T. Ry. Co., 92 Tex. 593, 50 S. W. 559; Cleburne, etc., Co. v. M., K. & T. Ry. Co. (Tex. Com. App.) 221 S. W. 271; G., C. & S. F. Ry. Co. v. Zimmerman, 81 Tex. 608, 17 S. W. 239; Grey's Ex'r v. Mobile Trade Co., 55 Ala. 387, 28 Am. Rep. 731; Mears v. N. Y., etc., R. R. Co., 75 Conn. 171, 52 Atl. 610, 56 L. R. A. 884, 96 Am. St. Rep. 194.

The case, in its incompleteness, would seem to be controlled by the principle involved in the following question and answer in Ryan v. M., K. & T. Ry. Co., above cited:

"When, therefore, the plaintiff makes out a prima facie case of negligence, by proving that the goods were not delivered, is this case rebutted by proof that they were not delivered by reason of a fact which may have existed, and the carrier still have been negligent? If

so, he can stop with the presumption of negligence arising from nondelivery still resting upon him, and call upon his adversary to further strengthen his own prima facie case, or it shall, lose this character altogether. This would be against all the rules of evidence."

[19] The part of the limitation just discussed related to loss by fire. Another portion of the same clause sought to exempt defendant from loss "by causes beyond its control." Necessarily, in order to absolve itself from loss "by causes beyond its control" the defendant, as in the case of loss by fire, had upon it the burden of proving that the loss was not due to its negligence. It is not thought that it did so.

In view of the fact that the evidence as a whole showed without dispute that the 26 bales of cotton were delivered to defendant and accepted by it as a common carrier and were, while in its custody as such, destroyed by fire, and that there is no evidence that the loss was without negligence on defendant's part, we are of the opinion that the trial court properly instructed a verdict for plaintiff, and that the judgment of the Court of Civil Appeals was correct, and we therefore recommend that those judgments be affirmed.

CURETON, C. J. The judgment recommended in the report of the Commission of Appeals is adopted, and will be entered as the judgment of the Supreme Court.