**Vernon DRUMMOND and Randolph R. Gillum, Appellants,**

v.

**Douglas P. HODGES, Appellee.**

No. 16905.

Court of Civil Appeals of Texas.

Dallas.

May 26, 1967.

Rehearing Denied July 21, 1967.

Timothy E. Kelley and George C. Chapman, of Thompson, Knight, Simmons & Bullion, Dallas, for appellants.

Frank R. Jewell, Dallas, for appellee.

DIXON, Chief Justice.

This suit was filed by appellee Hodges against Doctors Drummond and Gillum, appellants, of Mesquite, Texas, for medical malpractice. Judgment for $100,000 was rendered in favor of appellee based on a jury verdict.

Appellants are osteopathic physicians who with two other doctors were partners practicing as The Doctors' Clinic of Mesquite. The surgery which is the subject of this controversy took place in Mesquite General Hospital, a private institution where both appellants practice. Dr. Drummond is a general practitioner, not a surgeon. Dr. Gillum is a physician and sur-geon and also was administrator of the hospital.

As to both Dr. Drummond and Dr. Gillum, the jury made material findings which in substance were as follows: (1) at the time Hodges consulted Dr. Drummond and at the time he later consulted Dr. Gillum there existed an infected perirectal abscess adjacent to the anal opening of Hodges' body; (2) each of the doctors failed to obtain an adequate history of Hodges' physical condition and past medical treatment; (3) each of the doctors failed to make post-surgical inspections of the surgical site to determine the condition thereof; and each of the above failures was negligence and a proximate cause of Hodges' injuries.

As to Dr. Gillum the jury made additional findings as follows: (1) the doctor was negligent in failing to limit his surgery to the excising and draining of the external thrombotic hemorrhoid and the pimples or abscess, which was a proximate cause; (2) the hemorrhoid operation as performed by the doctor was a proximate cause of appellee's injuries; (3) the doctor undertook to perform a hemorrhoid operation without Hodges' authorization.

As to Hodges the jury found that his action in leaving Mesquite General Hospital in the manner he did on December 17, 1964 did not constitute negligence.

## EVIDENCE

Appellants base their appeal on thirty-four points of alleged error. The record evidence is voluminous, but appellants' points require a careful and detailed study of the evidence.

### 1. Hodges' Testimony.

(a) *Prior to the present* operation Hodges had undergone a great deal of medical treatment and surgery—nearly all of it in connection with his intestinal tract and rectal and anal areas.

In 1954 he was operated on in Arkansas for appendicitis. At that time he also had a peptic ulcer and hemorrhaging from his rectum. He was in the hospital about fifteen days during which time he was given medication and blood transfusions.

Hodges then went to California where he stayed and worked about ten months. While in California he had a perirectal abscess lanced. He was hospitalized for two or three days.

In 1955 he had an attack of colitis. Again he had rectal hemorrhaging and was in the hospital and had medication and blood transfusions.

In 1956 he came to Dallas and obtained employment at Chance Vought as an electrician after passing a physical examination. While in Dallas he was injured in an automobile accident in which the cartilage in his left knee was torn and his left wrist broken. Also he had another attack of colitis for which he was again admitted to the hospital for about fifteen days.

In 1958 he went to San Angelo, Texas, where he held several jobs. He testified that he had no physical problems there.

During a period beginning in 1959 he suffered attacks of colitis which came on once a year, usually in the spring of the year.

In 1960 he went to Louisiana where he had a recurrence of perirectal abscess. He again went to the hospital where the abscess was lanced. At that time he had another attack of colitis. He was in the hospital ten days and was again given blood transfusions.

In 1963 he had an attack of colitis and was in the hospital for thirty-one days after a serious operation.

Hodges testified that except for a short recovery period after each operation he was healthy and strong between operations. He held several jobs which required heavy manual labor. He was active in outdoor sports. He participated in motorcycle races in which he often rode up hills over rough ground. Frequently he went fishing with a number of friends and engaged in other outdoor activities. He had spells of frequent bowel movements but was able to control them. This testimony was corroborated by several witnesses who had worked with and been with Hodges on several jobs and on social occasions.

(b) *In 1964* there occurred the operation which is the subject of this suit. In December 1964 he suffered pain which he says he recognized as coming from a perirectal abscess—this was the third time he had suffered from a perirectal abscess. At the time he was employed at the Ford Motor Company, where his work had been satisfactory. After ten days of pain he went to Mesquite General Hospital. The receptionist told him he could see Dr. Drummond. He filled out and signed some forms.

He told Dr. Drummond he had an abscess and wanted it lanced. Dr. Drummond examined him by observation only and said, "Looks like you have hemorrhoid trouble too." He told Dr. Drummond he didn't know anything about hemorrhoids and didn't want to do anything about it. Dr. Drummond said they would lance the abscess next day.

Next day Hodges entered the hospital. He signed some more forms. He was given medicine to alleviate pain.

Dr. Gillum performed the operation. Hodges testified that he had not been examined by any doctor since Dr. Drummond examined him the day before. Nothing was said about a hemorrhoid operation. For three days following the operation he repeatedly asked for a doctor to come see him but none came.

He phoned to Mrs. Durgin, a trained nurse whose home was in Mesquite. She and her husband were personal friends of Hodges. Mrs. Durgin came to see him. They decided not to wait any longer for a

doctor to examine him. They left Mesquite General Hospital without saying anything to the doctors or hospital attendants and went to Mesquite Memorial Hospital emergency ward. Dr. Pirrung, a medical doctor, saw him there, but would not admit him to the hospital. Hodges says that Dr. Pirrung told him what had been done to him in the operation by Dr. Gillum. (This is not consistent with the testimony of Dr. Pirrung who said that Hodges gave him a history of hemorrhoidectomy by Dr. Gillum.) He then went to the Durgin home.

The Durgins phoned Dr. L. K. Raynor, a personal friend, a medical doctor who practiced in Graham, Texas, but at the time was visiting in Mesquite. Dr. Raynor examined Hodges and recommended hospitalization. They drove to Graham and Hodges entered the hospital at Graham, five days after the operation at Mesquite. Hodges remained at the Graham hospital from December 18 or 19, 1964 until January 10, 1965.

In describing the effects of the operation by Dr. Gillum, Hodges testified that he couldn't control bowel movements which occurred about every fifteen minutes. They had finally slowed down to one every hour and a half. He has not been able to obtain steady employment.

### 2. Dr. Raynor's Testimony.

Dr. Raynor, a medical doctor and surgeon practicing in Graham, Texas, was the only medical witness offered by Hodges. He corroborated Hodges' and Mrs. Durgin's testimony as to the occasion of his meeting Hodges in Mesquite and the trip to Graham where Hodges was admitted to the hospital. The trip from Mesquite to Graham was difficult due to Hodges' pain and diarrhea.

The abscess had not been lanced, so Dr. Raynor lanced it. Hodges was an abnormal man due to the fact he had previously had his entire colon removed and was sensitive to any rectal surgery.

The type of surgery done on Hodges at Mesquite increased risks of complications by scarring and infection of anus-rectal musculature, which caused loss of sphincter tone. The sphincter muscle controls bowel movements and, if weakened, lessened control results. When Hodges left the Graham Hospital the infection was gone but the diarrhea continued.

In answer to a hypothetical question Dr. Raynor testified that a reasonably prudent doctor would not have performed such extensive hemorrhoid surgery under the circumstances because (1) infection from abscess was present and (2) thrombus hemorrhoid can be handled by a simple incision and drainage.

In a written "Physician's Report, Release to Work" signed by Dr. Raynor on April 20, 1965 there are these notations:

"Original Diagnosis: Infected hemorrhoidectomy with persistent diarrhea.

"Complications: Loss of rectal sphincter control with persistent diarrhea.

"Final diagnosis: Persistent diarrhea following infected radial hemorrhoidectomy."

### 3. Dr. Vernon Drummond's Testimony.

Dr. Drummond, one of the appellants, testified that when he first saw Hodges the latter was complaining of intense pain. He gave the doctor a history of ulcerative colitis, attacks of diarrhea, and perirectal abscess. Dr. Drummond could examine Hodges only by observation because the rectal area was too sensitive to bear touching. No perirectal abscess was visible. He did see what looked like a small boil. He recommended hospitalization.

Dr. Drummond informed Dr. Gillum of his interview with Hodges. Next day Dr. Gillum gave Hodges a sigmoidoscope examination, which consists of inserting a tube into the rectum with a small light at the end of the tube so that the interior of

the rectum is illuminated for observation. Dr. Drummond was present but did not participate in the operation. He heard Dr. Gillum say that he saw no evidence of active ulcerative colitis, but the thrombotic hemorrhoid should come out.

On December 17th, two days after the operation, Dr. Drummond was asked to see Hodges. At the time he was in the emergency room and was finishing up his activity there so he could go see Hodges. That was the only time he was asked to see Hodges after the operation. Before he could get away from the emergency room he saw Hodges and someone with him going out the door. He never saw Hodges again.

### 4. Dr. Randolph Gillum's Testimony.

Dr. Gillum, an osteopathic physician, is engaged in general surgery. He saw Hodges at Dr. Drummond's request. Upon examination he found a large external hemorrhoid and two small pimples in the outside anal area. Dr. Gillum testified that he told Hodges the hemorrhoid should come out if no active ulcerative colitis was found. Hodges told him to go ahead and do whatever was necessary. When Dr. Gillum sought to obtain a more complete history of the patient's ailments, Hodges cut him short and told him to ask Dr. Drummond. The sigmoidoscope examination showed no active ulcerative colitis. There was no perirectal abscess. It was his best judgment that the hemorrhoid should come out. He did the operation. He "button-holed" the two little pimples—that is, he simply cut small circles around them and lifted them out.

Dr. Gillum says he saw Hodges that evening after the operation and each day thereafter until Hodges left the hospital. Hodges was making a normal recovery.

Dr. Gillum read from his "progress notes" for December 17, 1964 a memorandum as follows:

"Was advised by charge nurse that patient left hospital without dismissal. Treatment is incomplete and may suffer complications as a result of this action."

### 5. Testimony of Dr. John G. Martin

Dr. Martin, a medical doctor, operated on Hodges for colitis at Methodist Hospital in Dallas in 1963. Hodges gave him a long history of colitis and other illnesses. Sigmoidoscopic examination showed need to operate. Nearly all of Hodges' colon and sigmoid colon were removed. Only part of the colon was left.

Dr. Martin did not at that time perform a permanent ileostomy—that is, he did not close the anal opening and make a new opening in the side of Hodges' body for the expulsion or drainage of fecal matter.

Following the above operation Hodges was having two or three bowel movements per day if he stayed on his diet, and that situation was reasonably expected to continue in the future unless he had a recurrence of his ulcerative colitis. Hodges had ulcerative colitis in the segment left after the operation, but the doctor hoped that could be controlled by Azulfidine and a diet so that Hodges could "kind of half way lead a normal life."

Dr. Martin further testified as follows concerning the 1963 colitis operation:

"Q Doctor, based on your knowledge and experience in the field of general surgery, do you have an opinion as to the probable prognosis of Mr. Hodges, in view of what you know about him and what operation you performed?

"A This patient would almost certainly have future trouble with the distal segment of the large intestine. And, as a matter of fact, we felt from our examination that he had a small amount of involvement of this at the time we did our surgery.

"Q What sort of trouble would you expect him to have?

"A Simply a worsening of the ulcerative colitis involving the distal segment that was left.

"Q Doctor, in reasonable probability, do you think that based upon what you know about him and your operation, that he will require further surgery?

"A I—I would venture to say that this gentleman, as I stated in my consultation the first time I saw him, will eventually lose the distal rectum and anus and have a permanent ileostomy.

"Q Well, what is an ileostomy?

"A An ileostomy is an artificial opening through the abdominal wall and the ileum is the last part—the last segment— of the small intestine.

"Q I see. Now, doctor, your surgery, as I understand it, removed the entire colon, essentially.

"A Yes.

"Q What sort of bowel movements would you expect Mr. Hodges to have subsequent to your surgery and as a result of the removal of the colon?

"A Since the colon is one of the main organs for reabsorbing water from the liquid food, I would expect him to have at least soft to liquid stools.

"Q Well—

"A Eventually, the segment of colon that is left, after a colon resection, can re-educate itself, so-to-speak, so as to absorb increasing amounts, but most of the time this never gets to the point where they have a naturally—a normal consistency bowel movement."

The hospital records of Methodist Hospital include the written record of the operation performed on Hodges by Dr. Martin on March 14, 1963:

"Proposed Operation: Total Colectomy.

"Operation: (1) Fulgention of Divs in sigmoid; (2) Total colectomy & ileoproctostomy".

6. Testimony of Dr. John Pirrung.

Dr. Pirrung is a medical doctor who on December 17, 1964 was on duty in the emergency room at Mesquite Memorial Hospital in Mesquite. It was there that Hodges went after leaving Mesquite General Hospital. Dr. Pirrung examined Hodges but did not admit him to the hospital because the appearance of the wound "appeared to be the normal condition for a postoperative hemorrhoidectomy and fistulectomy." When asked whether an automobile trip to Graham, Texas would have a good or bad effect on Hodges, Dr. Pirrung replied that "in post operative surgery of this nature we do instruct our patients that they are to rest quietly at home. They're not to become involved in any activity for approximately seven to ten days after the operation. * * * Prolonged irritation of this area certainly isn't going to help it."

Other Testimony.

A witness who occupied the same room with Hodges at Mesquite General Hospital testified that he did not see any doctors come into the room to see Hodges during the three days Hodges was in the hospital. However, there was testimony that this witness was under heavy sedation, was given medicine to make him sleep and that he was absent from the room at times.

Hospital Records.

The hospital records of Mesquite General Hospital, Mesquite Memorial Hospital, Methodist Hospital, Graham General Hospital and Ford Motor Company medical office pertaining to Hodges were introduced into evidence.

The records of the Mesquite General Hospital contain a filled in authorization form signed by Hodges as follows:

"I hereby give my consent for the sigmoidoscopic internal and external hemorrhoidectomy and I.N.D. abscess. Whatever diagnostic procedures are—

and/or operations may be deemed advisable at the discretion of the surgeon, together with whatever anesthesia is necessary."

Mrs. Whitlock, nurse in charge, testified that the authorization form was filled out when Hodges signed it, she saw him sign it, and she herself then signed it as witness.

Hodges admitted that the form bore his signature, but says that he didn't see anything on the form when he signed it, and didn't know what it was.

## OPINION

In numerous points on appeal appellants attack the submission of Special Issues Nos. 1, 5, 6, 7, 14, 15, 16, 17, 21, 22, 23, 30, 31, 32, 33, 34, 35, 36, and 39,[1] because there was no evidence to support their submission, and, further, the court erred in not sustaining appellants' motions for instructed verdict and for judgment *non obstante veredicto.*

Among the grounds relied on by appellants in support of the above contentions are the following: (1) expert testimony is essential in medical malpractice cases except where the injury is so plain as to be within the common knowledge of laymen, Henderson v. Mason, 386 S.W.2d 879 (Tex.Civ. App., El Paso 1964, no writ); and (2) such expert testimony must come from a doctor of the same school of medicine as that of the defendant, Bowles v. Bourdon, 148 Tex. 1, 219 S.W.2d 779, 13 A.L.R.2d 1 (1949). However, appellants concede that the second of the above holdings has been qualified to the extent that doctors of different schools may testify in malpractice cases: (1) where the particular subject of inquiry is common to and equally recognized and developed in both schools of practice; and (2) where the subject of inquiry relates to the manner of use of electrical or mechanical applicances which are of common use in both schools of practice. Porter v. Puryear, 153 Tex. 82, 262 S.W.2d 933 (1953).

Appellants argue that appellee's only expert witness was Dr. Raynor, a medical doctor (allopath) whose testimony was not competent against appellants who are osteopaths. We do not agree. There was testimony that the methods and technique of the two schools in surgery of the type involved here are substantially the same. It was also brought out that doctors of the school of osteopathy study and practice surgery in accordance with methods laid down in many textbooks written by medical doctors. To obtain a license to practice doctors of the two schools must take the same State examination. The testimony

1. The issues in substance were as follows:
    1. Did Hodges have a perirectal abscess when he consulted Dr. Drummond?
    5. Did Dr. Drummond fail to obtain an adequate history of Hodges' physical condition and past medical treatment?
    6 and 7. Was above failure negligence and proximate cause?
    14. Did Dr. Drummond fail to make post surgical inspections?
    15 and 16. Was above failure negligence and proximate cause?
    17. Did there exist a perirectal abscess at the time Hodges consulted Dr. Gillum?
    21. Did Dr. Gillum fail to obtain an adequate medical history prior to surgery?
    22 and 23. Was above failure negligence and proximate cause?
    30. Did Dr. Gillum fail to make post surgical inspections?
    31 and 32. Was above failure negligence and proximate cause?
    33. Was failure of Dr. Gillum to limit the surgery to the excising and draining of external thrombotic hemorrhoid and the pimples or abscess negligence?
    34. Was above negligence proximate cause?
    35. Was the hemorrhoid operation a proximate cause?
    36. Did Dr. Gillum undertake to perform a hemorrhoid operation without Hodges' permission?
    39. This was the damage issue.
    The jury answered all the above issues favorably to appellee Hodges.
    The answer to No. 39 was $100,000.
    All other issues were answered favorably to appellants.

also shows that Dr. Gillum has attended the allopathic Mayo Clinic in Rochester, Minnesota for study and observation of surgery cases.

■ Dr. Raynor's testimony is weak. He did not see Hodges until three days after the operation in question. He was not in position to know of his own knowledge what the condition of Hodges was at the time Dr. Gillum performed the operation three days earlier. The testimony of doctors offered by appellants was quite favorable to appellants. But there was some testimony from appellants' doctors elicited in answer to hypothetical questions on cross-examination, which testimony, though also weak, probably amounts to more than a scintilla of evidence as to the wisdom of operating under the circumstances. We overrule the above points as far as they assert that there was no evidence to support submission of the above issues, with the exception of Special Issue No. 36.

■ We agree with appellants that there was no evidence to support submission of Special Issue No. 36, which inquired whether Dr. Gillum undertook to perform a hemorrhoid operation without Hodges' consent. It is undisputed that Hodges signed a written authorization for the operation. There is no pleading and no evidence of fraud, accident, mistake, undue influence or mental incapacity in connection with the signing of the authorization. Hodges merely says that he didn't see anything on several papers when he signed them. We sustain appellants' point of error No. 25.

■ In their points on appeal Nos. 9, 10, 15, 16, 18, 19, 21, 23, 24 and 26 appellants assert that it was error for the court to enter judgment based on the jury's answers to Special Issues Nos. 7, 16, 23, 32, 34, 35 and 39 because of the insufficiency of the evidence to support said answers. Each of the above issues inquired whether an alleged act of negligence on the part of appellants was a proximate cause of Hodg-

es' injuries. In each instance the jury answered in the affirmative. As differentiated from a "no evidence" point we take each of the above points to assert that the answer of the jury as to causation was so contrary to the overwhelming weight and preponderance of the evidence as to be manifestly wrong. In re King's Estate, 150 Tex. 662, 244 S.W.2d 660 (1951); Calvert, " 'No Evidence' or 'Insufficient Evidence' Points of Error", 38 Tex.L.R. 361.

It is undisputed that appellee Hodges has had a long and painful medical history including a peptic ulcer, perirectal abscesses, frequent attacks of colitis and diarrhea long before he was under the care of appellants. He had undergone numerous operations prior to the operation by Dr. Gillum in 1964. Nearly all of his colon and sigmoid colon had been removed in an operation by Dr. Martin in 1963 in an effort to enable him to lead "a half-way normal life." But the prognosis by Dr. Martin, a medical doctor, made at that time was that Hodges would eventually have to undergo a complete ileostomy—that is, his normal anal opening would have to be closed because of his inability to control his loose bowel movements and a new opening made in the side of his body for drainage purposes.

■ The testimony of Dr. Pirrung, a medical doctor, was that when he saw Hodges two days after the operation by Dr. Gillum the operative wound seemed normal so he refused to admit Hodges to the Mesquite Memorial Hospital. Dr. Pirrung also testified that rest and very little activity for seven or ten days was advisable following such an operation. Nevertheless, Hodges, following only two days after an operation for hemorrhoids rode in an automobile from Mesquite, Texas to Graham, Texas. We take a judicial notice that this was a trip of more than 100 miles. Griffin v. Duty, 286 S.W.2d 229 (Tex.Civ. App., Galveston 1956, no writ). After considering all the evidence we cannot escape the conclusion that the answers of

the jury that the acts and omissions of appellants were each a proximate cause of appellee's injuries are so contrary to the overwhelming weight of the evidence as to be manifestly wrong. On that ground appellants' points Nos. 9, 10, 15, 16, 18, 19, 21, 23, 24 and 26 are sustained.

Appellants present other points which we have considered and which are hereby overruled.

The judgment of the trial court is reversed and this cause is remanded to the trial court for another trial.

Reversed and remanded.

## ON REHEARING

■ There is evidence that appellee Hodges signed the written instrument quoted in our original opinion whereby he authorized the sigmoidoscopic internal and external hemorrhoidectomy. Hodges does not deny that he signed the instrument. He admits he signed a number of papers, but that he "didn't see anything on them." As we pointed out in our original opinion there was no pleading and no evidence of fraud, accident, mistake, undue influence or mental incapacity in connection with the signing of the quoted written instrument. Such being the case we cannot give any probative effect to his statement that he didn't see anything on the papers he signed, or his statement that he did not authorize the operation for hemorrhoidectomy though the statements were admitted without objection. Patton v. Crews, 264 S.W.2d 467 (Tex.Civ.App., Fort Worth 1954, writ ref'd n. r. e.); Texarkana & Ft. S. Ry. Co. v. Brass, 260 S.W. 828, 833 (Tex.Comm'n App. 1924, judgment adopted); So. Surety Co. v. Nalle & Co., 242 S.W. 197, 201 (Tex. Comm'n App.1922, holding approved); John E. Morrison Co. v. Riley, 198 S.W. 1031, 1033 (Tex.Civ.App., Fort Worth 1917, no writ); Henry et al v. Phillips, 105 Tex. 459, 151 S.W. 533, 538 (1912); 23 Tex.Jur. 2d 504.

Dr. Raynor was the only medical witness offered by appellee Hodges. The doctor's testimony included the following:

"Q. Did the area of the hemorrhoid surgery in any way involve this abscess you found?

"A. Only by proximity to it. It didn't go to the abscess itself. The abscess had not been opened, but still it was in what you would consider contaminated area.

"Q. Did you find any connection between the condition—the infectious condition of the abscess?

"A. Only in that operating near the abscess would make it prone to become infected."

\* \* \* \* \* \*

"Q. All right. Is there any doubt, doctor—any reason you could see why a physician or anyone looking at this rectal area of Mr. Hodges some four days before you saw him, couldn't have seen the presence of this infection?

"A. I would think they could have; yes."

\* \* \* \* \* \*

"Q. Doctor, by doing the extensive surgery that was done, as you found in Mr. Hodges, did this in any way increase the risks of complications to his rectal area?

"A. Yes.

"Q. In what ways?

"A. By the scarring that followed and the infection involving the anusrectal musculature."

\* \* \* \* \* \*

"Q. At the time you saw Mr. Hodges out at the Durgin residence, was there much deep involvement of tissues at that time, sir?

"A. Not with scarring up to that point. Scarring takes a little longer than four days, but the infection was present."

\* \* \* \* \* \*

"Q. Why did that diarrhea persist?

"A. That's a two-fold thing that you haven't covered completely. He had a scarring of the anus, which caused the loss of sphincter tone, but this was being aggravated by the pre-existing condition, which flared up, which was his previous surgery. *In other words, this was not a normal man.*" (Emphasis ours.)

\* \* \* \* \* \*

"Q. Doctor, assuming that this man had had surgery where the hemorrhoids had been removed, as they were in this man's case, wouldn't he have been inviting infection by leaving the hospital, putting on his clothes, going out and driving around in a car, having doctors examine him, and then getting in his clothes again and driving in a car to Graham, Texas? Wouldn't he be inviting infection?

"A. I wouldn't go so far as to say that.

"Q. Wouldn't he be more likely to get infection if he did that than if he stayed in the hospital?

"A. It was my understanding he had just been discharged very shortly before that."

\* \* \* \* \* \*

"Q. Well, if he was infected, as you say he was, and in great pain so that you couldn't touch him, as you say he was, wouldn't it have been better for him, regardless of where you were practicing, to get him into Baylor?

"A. *It wasn't that urgent, sir.*" (Emphasis ours.)

\* \* \* \* \* \*

"Q. So, anyway, the things that we have on record here do not indicate any infectious process, do they?

"A. You're referring only to the blood count.

"Q. No, I'm referring to the blood count and the temperature.

"A. He had extreme pain, required sitz baths, extensive narcotics, even much beyond the normal hemorrhoidectomy.

"Q. Yes, but the only two—and if you can find any other objective things in this record, besides your observation, that show infection, I wish you would point it out to me.

"A. He required daily dressings of his abscess."

\* \* \* \* \* \*

"Q. Okay. Now, doctor, are you—you saw this patient first late in the evening of December 17th, 1964?

"A. I believe that's right.

"Q. Now, are you telling this Court and Jury that you, as a doctor, know, or in reasonable probability know that four days prior to that—December 14th, in the morning or afternoon, of 1964—that this man had an abscess that was nearly as big as when you saw it?

"A. History is also important. He had an abscess.

"Q. 'History'—you mean what he told you.

"A. Yes. That is taken along with the size of the abscess and the duration. His knowledge of previous abscesses. I believe he had had two lanced over a number of years, and being an inch and a half or two inches from the anus was a pretty obvious thing to him."

\* \* \* \* \* \*

We have again studied the record in this case and must adhere to our original opinion: the answers of the jury to issues in regard to proximate cause are so contrary to the overwhelming weight and preponderance of the evidence as to be manifestly wrong.

The motion for rehearing is overruled.